## Case No. 14,795.

### UNITED STATES v. CISNA.

[1 McLean, 254.] [1]

Circuit Court, D. Ohio.    July Term, 1835.

INDIANS — POWER OF CONGRESS TO REGULATE INTERCOURSE AMONG — RESERVATION INCLUDED WITHIN STATE LIMITS—FEDERAL CRIMINAL JURISDICTION.

1. Under the power to regulate commerce with the Indian tribes, congress have power to prohibit all intercourse with them, except under a license.

[Cited in Oliver v. Liverpool & L. Ins. Co., 100 Mass. 537; Territory v. Guyot (Mont.) 22 Pac. 134.]

2. This power is the same as the power to regulate commerce among foreign nations, under which embargo laws have been enacted, and also laws of non-intercourse.

3. Under the treaty-making power, certain political relations have been established between the United States and the Indian tribes.

4. The laws regulating intercourse with the Indians, were intended to operate on communities, somewhat remote from a white population.

5. The exception in the act of 1802 [2 Stat. 139] refers to Indian tribes at that time surrounded by white settlements, as the remnant of tribes in Connecticut, Massachusetts, and other states.

6. The power of congress to regulate commerce with the Indians does not necessarily cease on their being included within the limits of a state.

[Cited in U. S. v. Seveloff, Case No. 16,252; U. S. v. Bridleman, 7 Fed. 897.]

[Cited in State v. McKenney (Nev.) 2 Pac. 172.]

7. The federal relations should be withdrawn from the Indians within a state, by the concurrent acts of the federal and state governments.

[Cited in U. S. v. Ward, Case No. 16,639.]

8. But if no such acts take place, and the Indians occupy a territory of very limited extent, surrounded by a white population, which necessarily have daily intercourse with the Indians, and it becomes impracticable to enforce the law, the federal jurisdiction must cease.

[Cited in U. S. v. Sa-Coo-Da-Cot, Case No. 16,212; Ex parte Sloan, Id. 12,944; U. S. v. McBratney, 104 U. S. 624; Bush v. Commonwealth of Kentucky, 107 U. S. 115, 1 Sup. Ct. 630.]

[Cited in State v. Doxtater, 47 Wis. 292.]

[Indictment against Jonathan Cisna.]

Mr. Swayne, U. S. Dist. Atty.
Mr. Parish, for defendant.

OPINION OF THE COURT. The defendant, having been indicted at the present term, for stealing a horse within the reservation of the Wyandott tribe of Indians, of the state of Ohio, of the goods and chattels of Henry Jocko, a friendly Indian, filed a demurrer to the indictment, which brings before the court the question, whether they can exercise jurisdiction in the case?

The indictment is founded on the fourth section of the act of congress, "to regulate trade and intercourse with the Indian tribes," passed 30th March, 1802 [2 Stat. 139], which provides: "If any citizen or other person shall go into any town, settlement, or territory belonging or reserved by treaty of the United States to any nation or tribe of Indians, and shall there commit robbery, trespass, or other crime, against the person or property of any friendly Indian or Indians, which would be punishable if committed within the jurisdiction of any state against a citizen of the United States, or, unauthorized by law or with a hostile intention, shall be found on any Indian land, such offender shall forfeit a sum not exceeding one hundred dollars, and be imprisoned not exceeding twelve months; and shall also, when property is taken or destroyed, forfeit and pay to such Indian or Indians, to whom the property taken or destroyed belongs, a sum equal to twice the just value of the property taken or destroyed, &c."

The Wyandott reserve is twelve miles square, and is situated in Crawford county, which for some years has been regularly organized as a county. And at the last session of the legislature of Ohio, a law was passed which declared, "that all white inhabitants, now or hereafter resident in said Wyandott reservation, shall be, and they are hereby made subject to the laws of the state of Ohio for the purpose of taxation, and for all civil, criminal, and military purposes, as other white citizens are now, or hereafter may be, in the different townships in the said county of Crawford, any law or custom to the contrary notwithstanding." Before the passage of this law the legislature had not, by express enactment, extended the jurisdiction of the state over this reserve; but in the general laws respecting crimes and punishments, it is not excepted from their operation. This reserve is surrounded by a dense white population, and public roads lead through it in various directions. It is admitted to be as much frequented by the white population as any other part of the county; and it would be extremely inconvenient, if not impracticable, for the citizens of the county to avoid entering the reserve in pursuing their ordinary and daily avocations.

On the 9th of January, 1789 [7 Stat. 28], the United States entered into a treaty with the Wyandott and other nations of Indians, in which it was agreed that if any citizen of the United States, or other person not being an Indian, shall settle on their land, such person shall forfeit the protection of the United States, and the Indians were at liberty to punish him or not, as they please. And all citizens or inhabitants of the United States were prohibited from hunting or destroying the game, or even entering on the Indian lands without a passport. Certain stipulations were made for the punishment of offences, such as horse-stealing, robbery, &c., and the Indians agreed to surrender the offenders among their tribes, who were to be punished equally with the citizens of the United States. At the time this treaty was

[1] [Reported by Hon. John McLean, Circuit Justice.]

formed, the Wyandott tribe owned a very extensive territory of rich and fertile country; but treaties of cession have been made from time to time, until their territory is restricted to twelve miles square.

By the act of 1802, above referred to, which regulates trade with the Indians, all citizens or residents of the United States are prohibited from entering into the Indian lands without a license, and penalties are provided for hunting on them, or committing depredations upon the property of Indians. Murder, by a white person, of an Indian, is punished with death; traders without license forfeit their merchandize; and a penalty is incurred by purchasing from an Indian a gun, any instrument of husbandry, a horse, or other specified articles of property. Jurisdiction is given to the superior courts in each of the territorial districts, and the circuit courts of the United States, of similar jurisdiction in criminal cases in each district of the United States in which any offender under the intercourse law shall be apprehended, or may be brought for trial. The peculiar relation which a tribe of Indians, that resides within the limits of a state, bears to the federal and state governments, renders every exercise of jurisdiction over their persons and property, by the federal government, a matter of great delicacy and importance. The federal government is one of limited and specific powers. It cannot exercise jurisdiction by implication, but is confined to the special grants of power in the constitution; and in carrying into effect these grants, the most appropriate means should be adopted, and no means beyond what are necessary to give effect to the power, can be legitimately used. All powers not delegated to the federal government, are reserved to the states and the people. The power to regulate commerce with foreign nations and among the several states, and with the Indian tribes, is given to congress in the constitution. And under this and the treaty making power, numerous treaties have been formed and laws enacted, to regulate commercial intercourse with the numerous Indian tribes which live within the federal limits. The validity of these treaties and laws, it is believed, has not been questioned, so far as they act upon the Indian tribes and our own citizens, beyond the boundaries of any state. But serious questions have arisen, and are likely again to arise, between the federal and state authorities, respecting the jurisdiction of the former, under these laws, over the territory of Indians situated within a state sovereignty.

Within this state no collisions on this important subject have occurred; but the principle on which jurisdiction is exercised by the federal government, must be the same, under the same circumstances, in every state. The supreme court of Ohio have not decided whether offences under the state laws, if committed within the Wyandott reserve, by a white person, may be punished; but a circuit court of common pleas have decided that no punishment can be inflicted in such a case. No one can read the laws for the regulation of our intercourse with the Indian tribes, without perceiving that they were designed to operate on and protect communities of Indians, remotely situated from our own population. In the act of 1802 is a provision that it shall not be so construed "as to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of the individual states." This provision applied to the condition of Indians at the time the law was passed; and at that time the Wyandott tribe was not only far more numerous than it now is, but its territory was extensive and remote from a white population. They did not reside within the ordinary jurisdiction of any state. The exception was applicable to remnants of tribes which resided in Massachusetts, Connecticut, and other Eastern states. No express provision has been made in treaties or by act of congress, at what period or under what circumstances the power of the federal government to regulate commerce with the Wyandott or any other tribe of Indians, living within a state, shall be terminated.

This is a question whether it shall be decided by the federal or state authorities as important as it is delicate; and it is much to be regretted that some rule on the subject has not been adopted which would prevent collisions of jurisdiction. A concurrent action by the federal and state governments, in regard to this matter, would seem to be the most appropriate method of withdrawing the regulation of the general and substituting that of the local authority. But the federal government has not acted on the subject, and the duty is now imposed upon this court to determine, whether the power to act belongs to the judicial branch of the government.

The question of jurisdiction which is raised by the demurrer is, whether the law under which this indictment has been found, can be carried into effect within the Wyandott reserve. Whether this is properly a judicial question may admit of some controversy. If the period at which the law shall be suspended could be fixed, at the time the state government was organized, there would be no difficulty on the subject. But the Wyandott tribe of Indians required as much the fostering care and superintending power of the federal government, for the protection of its trade in 1803, when Ohio was admitted into the Union, as for some years prior to that period—and the white population was almost as remote from the Indian settlements as it had been for years; and the state jurisdiction was not extended over the Indians, nor was there any difficulty in giving effect to the intercourse law of 1802. In addition to these considerations, the supreme court

have decided, that this law is not necessarily suspended within the limits of a state. If the provisions of the act of 1802 shall not apply to the case before the court, it must be upon the ground that they were unconstitutional when adopted, or have become inoperative by the progress of time and change of circumstances.

The former branch of this enquiry is strictly the exercise of a judicial power; but the latter, in most cases, at least, would seem to belong to the legislative department of the government. So far as it regards the policy of the federal government towards the Indians, within its constitutional powers, it is exclusively a question for the legislature; but as it respects any question of power between the federal and state governments, in whatever form it may arise, the judicial power is competent to decide it. During the whole course of our connection with the Indian tribes, we have recognized in them a power to make treaties, and certain political relations exist growing out of treaties between the federal government and almost every distinct tribe of Indians within our national limits. These relations may be extended by treaties as far as a sound policy, in the discretion of the treaty making power shall admit, where the Indians reside beyond the limits of a state; but within those limits neither the treaty making power nor the legislative power can be exercised so as to abridge the rights of a state.

Congress can exercise no power on this subject, beyond that of regulating commerce with the Indian tribes. The same power is given to congress to regulate commerce with foreign nations and among the several states. Under this investiture of power to regulate commerce with foreign nations, a wide scope of legislation has been exercised. But the regulation of commerce among the several states has been limited principally to certain prohibitions and the equalization of duties. Congress cannot effectually regulate commerce with the Indian tribes, without adopting such provisions by law, as shall preserve those tribes from an indiscriminate commercial intercourse with our own citizens; such is their inferiority in the business of commerce while in an uncivilized state, that their interests would be sacrificed, if left to an unrestricted intercourse. It was on this ground that the act of 1802 prohibited white persons from entering upon the Indian territory without a license, and further to give protection to the Indians, government agents were appointed to reside among them, and penal laws were enacted, as has been stated, against citizens of the United States for committing depredations upon the territory, the persons or the property of the Indians. The exercise of the power to prohibit any intercourse with the Indians, except under a license, must be considered within the power to regulate commerce with them, if such regulation could not be effectual short of an intercourse thus restricted. Under the power to regulate commerce with foreign nations, congress have passed non-intercourse, embargo and other laws, which restricted or altogether prohibited any commercial intercourse with those nations; and as the power to regulate commerce with the Indian tribes is given to congress in the same clause of the constitution, and in the same words, it would seem to follow that the power may be exercised to the same extent in the one case as in the other. There is nothing in the condition of the Indians, when under the exclusive jurisdiction of the federal government, nor in the constitution, which can operate against this construction. The power to regulate commerce among the several states is limited by other provisions of the constitution, by the nature of the power and the sovereignty of the states.

The law of 1802 is constitutional, and so the supreme court have decided. That this act had a constitutional operation upon the Wyandott Nation admits of no doubt; and it remains to be considered whether the situation of this tribe has become so changed as to render this law inoperative as to them. The territory of the Wyandotts, as before stated, is limited to twelve miles square, and it is surrounded by a dense white population, which have daily intercourse with the Indians. Stores and taverns are kept within the reservation by the Indians or those connected with them, which are as much resorted to for trade and other purposes, by the surrounding white population, as similar establishments in any other part of the country. The treaties made with this tribe have not been abrogated, and they hold their possessory right to the soil on the same tenure as other tribes with whom treaties have been made. And a sub-agent of the government still resides among them, through whom the government holds its official intercourse with the tribe. The Wyandotts have made rapid advances in the arts of civilization. Many of them are very intelligent; their farms are well improved, and they generally live in good houses. They own property of almost every kind, and enjoy the comforts of life in as high a degree as many of their white neighbors.

On a community of Indians situated in so limited a territory, and mixed up with and surrounded by a white population, which carries on with them almost every kind of commerce incident to their condition, can the acts which regulate intercourse with the Indians operate? For years past, as if by universal consent, they have not been enforced over this territory. They are wholly unsuited to the condition of the Wyandott tribe, and it would be impossible to give them a practical operation. And it may be said that the federal government by restricting the territory of this tribe, and encouraging their advances in civilization, has mainly contributed to produce this state of things.

But it is insisted that the larceny charged in the indictment may be punished under the act of congress cited, as it was committed within the reserve, and on the property of one of the Wyandott Indians. And how does congress derive power to punish this offence, when committed within a state? The answer must be, from the power to regulate commerce with the Indians. But if this tribe of Indians is so situated as to render the exercise of this power wholly impracticable, must it not of necessity cease? And does not the incident fall with the principal power? If congress had power to punish offences committed on the persons or property of Indians, generally, there could be no objection to the exercise of it without reference to circumstances. But when the power to punish is derived exclusively from the power to regulate commerce, it is perfectly clear, when the power to regulate commerce ceases, the power to punish must also cease. To exercise the power to punish for a violation of a regulation necessary to maintain a commercial intercourse with the Indian tribes, as the Wyandotts are now situated, and within their territory, would be a usurpation of power by the general government, and a direct infringement upon the rights of the states.

This conclusion cannot be resisted. And it is immaterial whether the intercourse law of 1802, has been expressly repealed as to the Wyandotts, or rendered inoperative by the force of circumstances. That the law cannot be enforced in this reserve is clear; and this state of things having been produced by the conjoint acts of the federal and state governments, it may be presumed that the former intended, as to this tribe, to abrogate the law. No other presumption can be raised from a state of facts, wholly incompatible with the provisions of the act. An act may be repealed as well by adopting subsequent and incompatible provisions, as by express enactments. And in this view the act of 1802, so far as it regulates trade with the Wyandott Indians, must be considered as substantially repealed. Has not the state jurisdiction to punish offences committed by its own citizens within the Wyandott reserve? Of this, I can entertain no doubt. Ever since the state government has been organized, it has had power to punish its own citizens for offences committed within its limits; whether within an Indian territory or not; and if there be no constitutional prohibition, the state has power to punish its own citizens for offences committed beyond its own limits. The laws of a state cannot operate extra-territorially; but having jurisdiction over its own citizens, the legislature if not prohibited by the constitution, could make certain acts committed by them beyond its own limits, and without the limits of any organized government, an offence. No process could be issued to arrest an offender beyond the state boundaries, but if he comes voluntarily within the state, he would subject himself to its jurisdiction.

By the first section of an act of the British parliament of the 31st Geo. III., passed in 1803, it is provided, "that from and after the passing of this act, all offences committed within any of the Indian territories, or parts of America not within the limits of either of the said provinces of Lower or Upper Canada, or of any civil government of the United States of America shall be, and shall be deemed to be offences of the same nature, and shall be tried in the same manner and subject to the same punishment as if the same had been committed within the provinces of Lower or Upper Canada." Many years ago, the state of Georgia punished its own citizens for depredations committed upon the Indian territory within the state, and no one has ever questioned the legality of such a procedure. The state of New York has not only punished its own citizens, for offences committed within the Indian reserve in that state, but has extended its jurisdiction in criminal cases, over the Indians. The jurisdiction of the federal government over the Indian territory within a state, under the most favorable circumstances for the exercise of the power is limited to the mere purposes of trade, and cannot prevent a state from punishing its own citizens for offences committed within such territory. The exercise of this power by a state, would not be incompatible with the exercise of the power vested in the federal government. There are many offences, such as counterfeiting the gold and silver coin of the country, the notes of the Bank of the United States, &c. which are punishable as well under the laws of the state as those of the Union.

But as it regards the case under consideration, all objections are obviated by the fact, that the regulations of congress respecting commerce with the Indian tribes, have not been enforced within the Wyandott reserve for years, and cannot for the reasons stated be now enforced. It may be admitted that property stolen in an adjoining state and brought into Ohio, would not subject the offender to a prosecution in this state. The offence having been committed in a distinct sovereignty, could not be punished in Ohio; but such a case would, in no respect, be similar to the one under consideration. The Indian territory within a state cannot be considered as a foreign jurisdiction. Under certain circumstances, it has been decided that a state cannot extend its laws over the Indian territory, within it, and especially when those laws are incompatible with constitutional regulations by the federal government. But the jurisdiction is not foreign. If the state have the fee of the Indian lands, it may dispose of that fee subject to the Indian right of occupancy. And in every other respect may the

state exercise a jurisdiction over the territory which shall not be incompatible with the constitutional regulations of the general government.

In the course of the argument by the district attorney, several adjudications of the supreme court, and a decision of the circuit court for the Eastern district of Tennessee, were referred to, as sustaining the jurisdiction in the present case. But the facts in this case are wholly dissimilar from those in the cases referred to, and they are not more so than the principles which apply to those facts. It is gratifying to reflect that the state laws will afford a more ample protection to the Wyandotts, as it regards their property, than the laws of the federal government. For the laws of the state punish with greater severity the offence charged in the indictment, than the laws of congress. And as it respects the Indians, no doubt can exist that their complaints will receive as prompt attention and as adequate redress, as those which are made by citizens of the state.

These considerations cannot enter into the question of jurisdiction; but they show that a decision against the jurisdiction of this court, will not leave the Indians unprotected, or lead to a failure of justice. The demurrer must be sustained.

It being suggested to the court by the district attorney, that prosecutions in the state court would be instituted against the defendant and the others against whom indictments had been found, for similar offences, the court directed the marshal to deliver over the defendants to the state authorities to answer, &c.