WARREN TRADING POST CO. *v.* ARIZONA TAX
COMMISSION ET AL.

No. 115.   Argued March 9, 1965.—Decided April 29, 1965.

*Edward Jacobson* argued the cause and filed briefs for
appellant.

*Philip M. Haggerty,* Assistant Attorney General of
Arizona, argued the cause for appellees.   With him on
the brief were *Robert W. Pickrell,* Attorney General, and
*Walter O. Holm,* Assistant Attorney General.

Briefs of *amici curiae,* urging reversal, were filed by
*Solicitor General Cox* and *Roger P. Marquis* for the
United States; by *Arthur Lazarus, Jr.,* and *Royal D.
Marks* for the Association on American Indian Affairs,
Inc., et al.; by *Norman M. Littell* and *Leland O. Graham*
for the Navajo Tribe of Indians, and by *Edward B. Berger*
for the Papago Tribe.

MR. JUSTICE BLACK delivered the opinion of the Court.

Arizona has levied a tax of 2% on the "gross proceeds
of sales, or gross income" of appellant Warren Trading
Post Company, which does a retail trading business with

Indians on the Arizona part of the Navajo Indian Reservation under a license granted by the United States Commissioner of Indian Affairs pursuant to 19 Stat. 200, 25 U. S. C. § 261 (1958 ed.).[1] Appellant claimed that as applied to its income from trading with reservation Indians on the reservation the state tax was invalid as (1) in violation of Art. I, § 8, cl. 3, of the United States Constitution, which provides that "Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes"; (2) inconsistent with the comprehensive congressional plan, enacted under authority of Art. I, § 8, to regulate Indian trade and traders and to have Indian tribes on reservations govern themselves. The State Supreme Court rejected these contentions and upheld the tax, one Justice dissenting. 95 Ariz. 110, 387 P. 2d 809. The case is properly here on appeal under 28 U. S. C. § 1257 (2) (1958 ed.). Since we hold that this state tax cannot be imposed consistently with federal statutes applicable to the Indians on the Navajo Reservation, we find it unnecessary to consider whether the tax is also barred by that part of the Commerce Clause giving Congress power to regulate commerce with the Indian tribes.

The Navajo Reservation was set apart as a "permanent home" for the Navajos in a treaty made with the "Navajo nation or tribe of Indians" on June 1, 1868.[2] Long before that, in fact from the very first days of our Government, the Federal Government had been permitting the Indians largely to govern themselves, free from state

---

[1] Ariz. Rev. Stat. §§ 42–1309, 42–1312. The tax is applicable to "every person engaging or continuing within this state in the business of selling any tangible personal property whatever at retail," with stated exceptions. Ariz. Rev. Stat. § 42–1312. Appellant's challenge to these statutes is limited to the State's attempt to apply them to gross income from sales made on the reservation to reservation Indians.

[2] 15 Stat. 667.

interference,[3] and had exercised through statutes and treaties[4] a sweeping and dominant control over persons who wished to trade with Indians and Indian tribes. As

[3] Arizona was admitted to the Union on its agreement that "the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to . . . all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States . . . ." Act of June 20, 1910, 36 Stat. 557, 569. See also Act of Aug. 21, 1911, 37 Stat. 39.

Certain state laws have been permitted to apply to activities on Indian reservations, where those laws are specifically authorized by acts of Congress, or where they clearly do not interfere with federal policies concerning the reservations. See *Organized Village of Kake v. Egan*, 369 U. S. 60, 72–75; *Williams v. Lee*, 358 U. S. 217, 219–221; *Thomas v. Gay*, 169 U. S. 264; *Utah & N. R. Co. v. Fisher*, 116 U. S. 28, 31–32. Compare, *e. g.*, 18 U. S. C. § 1161 (1958 ed.) (permitting application of state liquor law standards within an Indian reservation under certain conditions); 45 Stat. 1185, as amended, 25 U. S. C. § 231 (1958 ed.) (permitting application of state health and education laws within a reservation under certain conditions); 18 U. S. C. § 1162 (1958 ed.) and 28 U. S. C. § 1360 (1958 ed.) (respectively granting certain States criminal and civil jurisdiction over offenses and causes of action involving Indians within specified Indian reservations).

[4] In 1778, in its first treaty with an Indian tribe, the United States promised to provide for the Delaware Nation "a well-regulated trade, under the conduct of an intelligent, candid agent, with an adequate sallery, one more influenced by the love of his country, and a constant attention to the duties of his department by promoting the common interest, than the sinister purposes of converting and binding all the duties of his office to his private emolument . . . ." Treaty of Sept. 17, 1778, Art. V, 7 Stat. 13, 14. Similar provisions were found in other early treaties, concluded before the first Congress legislated on the subject of Indian trade. See United States Department of the Interior, Federal Indian Law 96 (hereafter cited as Federal Indian Law). In 1871 Congress forbade

Chief Justice John Marshall recognized in *Worcester* v. *Georgia,* 6 Pet. 515, 556–557:

> "From the commencement of our government, congress has passed acts to regulate trade and intercourse with the Indians; which treat them as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate."

He went on to say that:

> "The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union." *Id.,* at 557.

See also, *e. g., United States* v. *Forty-three Gallons of Whiskey,* 93 U. S. 188. In the very first volume of the federal statutes is found an Act, passed in 1790 by the first Congress, "to regulate trade and intercourse with the Indian tribes," requiring that Indian traders obtain a license from a federal official, and specifying in detail the conditions on which such licenses would be granted.[5]

Such comprehensive federal regulation of Indian traders has continued from that day to this.[6] Existing statutes make specific restrictions on trade with the Indians,[7] and

---

future treaties with the Indian tribes but left the obligations of existing treaties unimpaired. 16 Stat. 544, 566, now 25 U. S. C. § 71 (1958 ed.).

[5] Act of July 22, 1790, 1 Stat. 137.

[6] See generally Federal Indian Law 94–138, 373–381.

[7] *E. g.,* 4 Stat. 729, now 25 U. S. C. § 263 (1958 ed.) (empowering the President in the public interest to forbid introduction of any or all goods into the territory of a tribe, and to revoke and refuse all licenses to trade with that tribe); 4 Stat. 729, as amended, now 25 U. S. C. § 264 (1958 ed.) (establishing penalties for trading without a license and forbidding traders to hire white persons as clerks unless licensed to do so); 18 U. S. C. § 3113 (1958 ed.) (forbidding unlawful introduction of liquor into Indian country and providing for revocation of the license of any trader violating this prohibition).

one of them, passed in 1876 and tracing back to comprehensive enactments of 1802 [8] and 1834,[9] provides that the Commissioner of Indian Affairs shall have "the sole power and authority to appoint traders to the Indian tribes" and to specify "the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." [10]   Acting under authority of this statute and one added in 1901,[11] the Commissioner has promulgated detailed regulations prescribing in the most minute fashion who may qualify to be a trader and how he shall be licensed; penalties for acting as a trader without a license; conditions under which government employees may trade with Indians; articles that cannot be sold to Indians; and conduct forbidden on a licensed trader's premises.[12]   He has ordered that detailed business records be kept and that government officials be allowed to inspect these records to make sure that prices charged are fair and reasonable; that traders pay Indians in money; that bonds be executed by proposed licensees; and that the governing body of an Indian reservation may assess from a trader "such fees, etc., as it may deem appropri-

---

[8] Act of March 30, 1802, 2 Stat. 139.

[9] Act of June 30, 1834, 4 Stat. 729.

[10] 19 Stat. 200, 25 U. S. C. § 261 (1958 ed.), provides:

"The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians."

[11] 31 Stat. 1066, as amended, 25 U. S. C. § 262 (1958 ed.), provides:

"Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians."

[12] 25 CFR §§ 251.9, 252.6, 251.3, 252.3, 251.5, 251.8, 251.18, 251.19, 251.21, 252.15.

ate." [13]   It was under these comprehensive statutes and regulations that the Commissioner of Indian Affairs licensed appellant to trade with the Indians on the Navajo Reservation.   These apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders.[14]   In fact, the Solicitor's Office of the Department of the Interior in 1940 [15] and again in 1943 [16] interpreted these statutes to bar States from taxing federally licensed Indian traders on their sales to reservation Indians on a reservation.   We think those rulings were correct.

Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities.   And in compliance with its treaty obligations the Federal Government has provided for roads, education and other services needed by the Indians.[17]   We

---

[13] 25 CFR §§ 252.7, 251.22, 251.24, 251.10, 252.9, 252.27c.  See generally 25 CFR §§ 251, 252.

[14] These statutes and regulations apply only to activities on reservations.  See *Taylor* v. *United States*, 44 F. 2d 531 (C. A. 9th Cir.), cert. denied, 283 U. S. 820; 57 I. D. 124, 125.

[15] 57 I. D. 124.

[16] 58 I. D. 562.

[17] Since 1950 Congress has authorized expenditure of over $100,-000,000 as part of an extensive plan to rehabilitate the Navajo and Hopi tribes of Arizona.  64 Stat. 44, as amended, 25 U. S. C. §§ 631–640 (1958 ed.).  Detailed accounts of the ways in which the Federal Government has aided and supported the Navajos and other tribes may be found in Secretary of the Interior, Annual Report, 1963, pp. 11–47; *id.*, 1962, pp. 7–44; *id.*, 1961, pp. 277–318.  See also Federal Indian Law 268–306; Young, The Navajo Yearbook, Report No. viii, 1951–1961, A Decade of Progress (1961).

think the assessment and collection of this tax would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts. This state tax on gross income would put financial burdens on appellant or the Indians with whom it deals in addition to those Congress or the tribes have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commissioner. And since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax.[18] Insofar as they are applied to this federally licensed Indian trader with respect to sales made to reservation

---

[18] The Buck Act, now 4 U. S. C. §§ 105–110 (1964 ed.), in which Congress permitted States to levy sales or use taxes within certain federal areas, has been interpreted by what appears to be the only court to consider the question before this case, and by the Interior Department, as not applying tŏ Indian reservations. *Your Food Stores, Inc.* v. *Village of Espanola,* 68 N. M. 327, 334, 361 P. 2d 950, 955–956; 58 I. D. 562. Cf. 4 U. S. C. § 109 (1964 ed.), excepting taxes on Indians from the scope of the Act. We think that interpretation was correct. See S. Rep. No. 1625, 76th Cong., 3d Sess., 2, 3. Moreover, we hold that Indian traders trading on a reservation with reservation Indians are immune from a state tax like Arizona's, not simply because those activities take place on a reservation, but rather because Congress in the exercise of its power granted in Art. I, § 8, has undertaken to regulate reservation trading in such a comprehensive way that there is no room for the States to legislate on the subject. Cf. *Surplus Trading Co.* v. *Cook,* 281 U. S. 647, 651. Even assuming that the Arizona tax here is of a kind to which the Buck Act applies, nothing whatever in that Act suggests to us that Congress meant to give States new power to tax federally licensed Indian traders. See 58 I. D. 562.

Indians on the reservation, these state laws imposing taxes cannot stand. Cf. *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218. The judgment of the Supreme Court of Arizona is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*