589 P.2d 426

STATE of Arizona, State Tax Commission of Arizona, Appellant,

v.

CENTRAL MACHINERY COMPANY, an Arizona Corporation, Appellee.

No. 13593.

Supreme Court of Arizona,
In Banc.

Dec. 4, 1978.

Rehearing Denied Jan. 23, 1979.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Atty. Gen. by Ian A. Macpherson, Asst. Atty. Gen., Phoenix, for appellant.

Burton G. Hirsch, Phoenix, Rodney B. Lewis, Sacaton, for appellee.

STRUCKMEYER, Vice Chief Justice.

This appeal arises out of an action brought by the Central Machinery Company for a refund of sales taxes in the amount of $2,916.62, paid under protest. The Superior Court of Maricopa County entered judgment in favor of Central Machinery, and this appeal followed. Judgment reversed.

The parties in their second agreed statement stipulated to these facts: Central Machinery is an Arizona corporation and maintains an office in Casa Grande, Arizona, which is not on an Indian reservation. In 1973, agents of Central Machinery went onto the nearby Gila River Indian Reservation to solicit the sale of farm machinery from the Gila River Farms, an enterprise of the Gila River Indian Community. The Gila River Indian Community is an Indian Entity existing under the authority of 48 Stat. 984, 25 U.S.C. 461, et seq. After a period of negotiation, Gila River Farms executed a purchase order for eleven John Deere tractors at a total price of $100,-137.26. An item of $2,916.62, Arizona's Transaction Privilege Tax, was included in the total purchase price. Delivery of the tractors was made by the John Deere Company to Central Machinery in Casa Grande, Arizona. Central Machinery, after servicing the tractors, delivered them to the Gila

River Farms on the Indian reservation at Sacaton, Arizona. Central Machinery did not possess a federal license to trade on any Indian reservation and, although it could have been excluded from the solicitation of business on the reservation by the Superintendent of the Pima Indian Agency, the Bureau of Indian Affairs gave permission to Central Machinery to sell the tractors to the Gila River Farms. The purchase order provides for delivery of the tractors F.O.B. Sacaton. Payment to Central Machinery was by check delivered on the Gila River Indian Reservation. Central Machinery, if it recovers in this action, will remit the amount of the recovery to Gila River Farms.

In the court below, on summary motion, a judgment in favor of Central Machinery was entered. The trial court felt, and so stated, that the decision in *Warren Trading Post v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), prohibited this tax. But we do not think so.

In *Warren,* Arizona attempted to levy a tax upon the gross proceeds of sales of the Warren Trading Post Company. The company did a retail trading business with Indians on the Navajo Indian Reservation under a license granted by the United States Commissioner of Indian Affairs pursuant to 19 Stat. 200, 25 U.S.C. § 261 (1958 ed.). The United States Supreme Court decision pointed out that the federal government had comprehensively regulated Indian traders and that existing statutes made specific restrictions on trade with the Indians. Under authority of Congress's Acts, the Commissioner of Indian Affairs had promulgated detailed regulations "prescribing in the most minute fashion who may qualify to be a trader and how he shall be licensed; * * * conditions under which government employees may trade with Indians; articles that cannot be sold to Indians; and conduct forbidden on a licensed trader's premises." The opinion concluded:

"These apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders."

The Court also said:

"We think the assessment and collection of this tax would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon *Indian traders* for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts." (Emphasis added.)

It is clear that *Warren* was decided on the theory of federal preemption. It is also clear that by the use of the words "Indian traders" the Court meant a defined group of persons licensed under authority of United States statutes to carry on the business of trading on Indian reservations with Indians.

This case is clearly distinguishable. Central Machinery is not an "Indian trader", although it may on occasions do business with reservation Indians, even to the extent of going on the reservation to solicit business. Since Central Machinery is not an Indian trader within the meaning of *Warren* and since this transaction has not run afoul of any congressional enactments passed to protect and guard its Indian wards, we do not find a federal preemption which would forbid the imposition of this tax.

The foregoing is sufficient to settle the dispute in this case. However, Central Machinery seems to be asserting that because the economic burden of the tax falls upon the Indians, it is somehow immune from the imposition of the tax. As to this, it has been repeatedly held that where the economic burden falls is not the controlling factor. *Fort Mohave Tribe v. County of San Bernardino,* 543 F.2d 1253 (9th Cir. 1976); *Agua Caliente Band of Mission Indians v. County of Riverside,* 442 F.2d 1184 (9th Cir. 1971), *cert. denied* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972), *rehearing*

*denied* 405 U.S. 1033, 92 S.Ct. 1280, 31 L.Ed.2d 491 (1972), *motion for leave to file second petition for rehearing denied* 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 163 (1972); *G. M. Shupe, Inc. v. Bureau of Revenue,* 89 N.M. 265, 550 P.2d 277 (1976).

The factors controlling the imposition of a state tax have recently been set forth in *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976):

> "We see nothing in this burden which frustrates tribal self-government, see *Williams v. Lee,* 358 U.S. 217, 219–220, 79 S.Ct. 268, 270, 3 L.Ed.2d 251, 253 (1959), or runs afoul of any congressional enactment dealing with the affairs of reservation Indians, *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410, 413 (1938): 'Enactments of the federal government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments.'" *Id.* at 483, 96 S.Ct. at 1646.

No claim is made that Arizona's tax conflicts with any enactment of the federal government passed to protect and guard its Indian wards.

Judgment of the Superior Court reversed.

CAMERON, C. J., and HAYS and HOLOHAN, JJ., concurring.

GORDON, Justice (dissenting):

I must dissent from the majority opinion, because it distinguishes *Warren Trading Post v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) from the facts of this case. I believe that *Warren, supra,* controls and prohibits the imposition of the tax in question.

In both *Warren, supra,* and in this case, the vendors are non-Indians making sales to Indians on reservation land. The tax in dispute in both cases is the same, and in both, although the non-Indian seller is legally required to pay the tax, the economic impact is borne by the Indian buyer. The tax was invalidated in *Warren* but is upheld here. Only two meaningful differences exist between the cases: Central Machinery did not maintain a permanent place of business on the reservation and did not possess a trader's license. Neither of these differences merits the outcome of the majority opinion.

## CENTRAL MACHINERY'S LACK OF A PERMANENT PLACE OF BUSINESS

Volume 25 C.F.R. § 251.9(b) provides for the licensing of "[i]tinerant peddlers * * as traders." Peddler is defined in 25 C.F.R. § 252.3(i) as "a person who offers goods for sale within the exterior boundaries of the Hopi, Navajo or Zuni Reservations, but does not do business from a fixed location or site on any of those reservations." Section 252 deals with business practices on the Navajo, Hopi, and Zuni reservations and, therefore, is not binding on this case. Its definitional section, however, can reasonably be consulted to construe § 251, which is without such a definitional aid. It would be illogical to believe that the term "peddler" in each of these parts refers to different types of people. The obvious purpose of sections 251 and 252 is to protect the reservation Indians from unscrupulous vendors, whether they be based on the reservation or off. Central Machinery's lack of a permanent place of business on the reservation is not fatal, therefore, to its claim that it should be granted the tax preference extended to Indian traders. A peddler can be licensed as a trader. This issue was raised and briefed by the parties, but is not discussed in the majority opinion.

## CENTRAL MACHINERY'S LACK OF A TRADER'S LICENSE

Central Machinery sold tractors to Gila River Farms without first being licensed pursuant to 25 C.F.R. § 251.9(b), which requires that such a license or permit be obtained from the Superintendent of the Pima Agency, the Bureau of Indian Affairs agency supervising the reservation. Approval, therefore, was obtained from the very person authorized to grant a license.

It is unclear from the record why a license or permit was not obtained. To penalize the Indian purchaser because the specific licensing procedure was not followed is illogical, especially in light of the Bureau of Indian Affairs' knowledge and approval of the transaction. The license requirement is for the protection of Indians. *Warren, supra.* Sanctions for violation of the licensing regulations include forfeiture of all merchandise offered for sale and a fine of $500.00. 25 C.F.R., § 251.3. The penalty is to punish the trader, not the Indian. If Central Machinery's failure to have a license were to remove this case from the protection of *Warren,* the result would compel the Indians to pay economic sanctions to Arizona because of the Bureau of Indian Affairs' failure to enforce its regulations. As the trial court's opinion stated, "Nowhere do the federal statutes and regulations indicate that non-compliance by a trader or the Bureau of Indian Affairs will allow imposition of state laws which would otherwise be inapplicable. It is the existence of the federal laws and accompanying regulations and not their enforcement which preempts the State's ability to tax the transaction in question."

## ECONOMIC IMPACT

The majority opinion concludes that the tax in question is not barred, because it is imposed on the seller, Central Machinery, and not on the Indian buyer. *First Agricultural National Bank v. State Tax Commission,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968), however, held that in questions of immunity, the Supreme Court is not bound by a state court's characterization of a tax. There a state sales tax was levied against the seller but passed on to the purchaser. The purchaser was a federal bank, and, like the Gila Indians, was immune from tax. The Supreme Court ignored the state's contention that the tax was not on the bank and found it impermissible. In *Warren, supra,* the Supreme Court has already addressed the status of the tax in question and held it to be impermissible when levied against licensed Indian traders.

Furthermore, I believe the facts in this case show that the financial impact of Arizona's tax falls directly on the Indians as passed on by the vendor and that the cases dealing with taxation of Indians *do* focus on economic impact. This in fact appears to be the decisive factor in determining if a tax will be upheld. In *G. M. Shupe, Inc. v. Bureau of Revenue,* 89 N.M. 265, 550 P.2d 277 (1976), a corporation constructing a dam on reservation land for the Department of the Interior was not exempt from state tax. The activity was merely on Indian lands, and the tribe would suffer no direct effect because of the tax. In *Fort Mohave Tribe v. County of San Bernardino,* 543 F.2d 1253 (9th Cir. 1976), non-Indians leasing Indian land had to pay a tax on the land. Although this might have had an indirect effect on the Indians' bargaining power, the direct result was to give the non-Indian leasee a more attractive investment. In *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) an Indian selling cigarettes on the reservation was required to pay a sales tax on cigarettes sold to non-Indians, but not on cigarettes sold to other Indians. Although the Indian vendor argued that he would suffer an out-of-pocket loss, the only certainty was that the non-Indian buyer would benefit. The effect on the Indian seller was too indirect.

In none of the cases in which a tax is upheld is an Indian the consumer who is directly hit. The direct impact is on the non-Indian, and the effect on the Indian is to some degree speculative. In *Warren, supra,* and in this case, it is the Indian consumer who must directly bear the burden. The subsequent case law is not an inroad on *Warren,* which still controls this issue and renders the tax imposed on Central Machinery illegal.

I must, therefore, respectfully dissent.