CENTRAL MACHINERY CO. *v.* ARIZONA STATE TAX
COMMISSION

No. 78-1604.   Argued January 14, 1980—Decided June 27, 1980

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and BLACKMUN, JJ., joined. STEWART, J., filed a dissenting opinion, in which POWELL, REHNQUIST, and STEVENS, JJ., joined, *post,* p. 166. POWELL, J., filed a dissenting opinion, *post,* p. 170.

*Rodney B. Lewis* argued the cause for appellant. With him on the briefs were *Richard B. Collins, Jeanne S. Whiteing,* and *Z. Simpson Cox.*

*Ian A. Macpherson,* Assistant Attorney General of Arizona, argued the cause for appellee. With him on the brief was *Robert K. Corbin,* Attorney General.

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman,* and *Robert L. Klarquist.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether a State may tax the sale of farm machinery to an Indian tribe when the sale took place on an Indian reservation and was made by a corporation that did not reside on the reservation and was not licensed to trade with Indians.

I

Appellant is a corporation chartered by and doing business in Arizona. In 1973 it sold 11 farm tractors to Gila River Farms, an enterprise of the Gila River Indian Tribe. The Tribe is federally recognized and is governed by a constitution adopted pursuant to the Indian Reorganization Act, 25 U. S. C. § 476. Gila River Farms conducts farming operations on tribal and individual trust land within the Gila River Reservation, which was established in Arizona by the Act of Feb. 28, 1859, ch. 66, 11 Stat. 388, 401.

Appellant's salesman solicited the sale of these tractors on the reservation, the contract was made there, and payment for and delivery of the tractors also took place there. Appellant does not have a permanent place of business on the reservation, and it is not licensed under 25 U. S. C. §§ 261–264 and 25 CFR Part 251 (1979) to engage in trade with Indians on reservations. The transaction was approved, however, by the Bureau of Indian Affairs.

The State of Arizona imposes a "transaction privilege tax" on the privilege of doing business in the State. Ariz. Rev. Stat. Ann. §§ 42–1309, 42–1312, 42–1361 (Supp. 1979).[1]

---

[1] At the time of the transaction in question, Ariz. Rev. Stat. Ann. § 42–1309 (Supp. 1979) provided:

"A. There is levied and there shall be collected . . . privilege taxes measured by the amount or volume of business transacted by persons on

The tax amounts to a percentage of the gross receipts of the taxable entity. The tax is assessed against the seller of goods, not against the purchaser. In this case, appellant added the amount of this tax—$2,916.62—as a separate item to the price of the tractors, thereby increasing by that amount the total purchase price paid by Gila River Farms. Appellant paid this tax to the State under protest and instituted state administrative proceedings to claim a refund.[2] The administrative claim was denied, and appellant then filed this action in state court, contending that federal regulation of Indian trading pre-empted application of the state tax to the transaction in question. The Superior Court for Maricopa County held that the State had no jurisdiction to tax the transaction, and accordingly it ordered a refund. The Supreme Court of Ari-

account of their business activities, and in the amounts to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the schedule as set forth in §§ 42–1310 through 42–1315."

At the time of the transaction, Ariz. Rev. Stat. Ann. § 42–1312 (Supp. 1979) provided:

"A. The tax imposed by subsection A of § 42–1309 shall be levied and collected at an amount equal to two per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the business of selling any tangible personal property whatever at retail. . . ."

At the time of the transaction, Ariz. Rev. Stat. Ann. § 42–1361 (Supp. 1973) provided:

"A. There is levied and shall be collected by the department of revenue a tax:

"1. On the privilege of doing business in this state, measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application, against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the provisions and schedules as set forth in [§ 42–1301 et seq.], at rates equal to fifty per cent of the rates imposed in such article." 1973 Ariz. Sess. Laws, ch. 123, § 117.

[2] It is stipulated that appellant will pay over any tax refund to Gila River Farms.

zona reversed. *State* v. *Central Machinery Co.*, 121 Ariz. 183, 589 P. 2d 426 (1978).

We noted probable jurisdiction, 444 U. S. 822 (1979), and now reverse.

## II

In 1790, Congress passed a statute regulating the licensing of Indian traders. Act of July 22, 1790, ch. 33, 1 Stat. 137. Ever since that time, the Federal Government has comprehensively regulated trade with Indians to prevent "fraud and imposition" upon them. H. R. Rep. No. 474, 23d Cong., 1st Sess., 11 (1834) (Committee Report with respect to Indian Trade and Intercourse Act of 1834, ch. 161, 4 Stat. 729). In the current regulatory scheme, the Commissioner of Indian Affairs has "the sole power and authority to appoint traders to the Indian tribes and to make . . . rules and regulations . . . specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U. S. C. § 261. All persons desiring to trade with Indians are subject to the Commissioner's authority. 25 U. S. C. § 262. The President is authorized to prohibit the introduction of any article into Indian land. 25 U. S. C. § 263. Penalties are provided for unlicensed trading, introduction of goods, or residence on a reservation for the purpose of trade. 25 U. S. C. § 264. The Commissioner has promulgated detailed regulations to implement these statutes. 25 CFR Part 251 (1979).

In *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685 (1965), the Court unanimously held that these "apparently all-inclusive regulations and the statutes authorizing them," *id.*, at 690, prohibited the State of Arizona from imposing precisely the same tax as is at issue in the present case on the operator of a federally licensed retail trading post located on a reservation. We determined that these regulations and statutes are "in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so

fully in hand that no room remains for state laws imposing additional burdens upon traders." *Ibid.* We noted that the Tribe had been left "largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities." *Ibid.* See *White Mountain Apache Tribe* v. *Bracker, ante,* at 152.

There are only two distinctions between *Warren Trading Post, supra,* and the present case: appellant is not a licensed Indian trader, and it does not have a permanent place of business on the reservation.[3] The Supreme Court of Arizona concluded that these distinctions indicated that federal law did not bar imposing the transaction privilege tax on appellant. We disagree.

The contract of sale involved in the present case was executed on the Gila River Reservation, and delivery and payment were effected there. Under the Indian trader statutes, 25 U. S. C. §§ 261–264, this transaction is plainly subject to federal regulation. It is irrelevant that appellant is not a licensed Indian trader. Indeed, the transaction falls squarely within the language of 25 U. S. C. § 264, which makes

---

[3] It is irrelevant that the sale was made to a tribal enterprise rather than to the Tribe itself. See *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 157, n. 13 (1973). Nor may appellee distinguish the present case from *Warren Trading Post* by contending that the tax at issue in this case falls upon the seller of goods and not the buyer because it is a tax on the privilege of doing business in Arizona rather than a sales tax. The tax at issue in the present case is precisely the same tax as was involved in *Warren Trading Post.* The argument made by appellee in the present case was used by the Supreme Court of Arizona in *Warren Trading Post* to uphold imposition of the tax. *Warren Trading Post Co.* v. *Moore,* 95 Ariz. 110, 387 P. 2d 809 (1963). Our reversal of that decision recognized that, regardless of the label placed upon this tax, its imposition as to on-reservation sales to Indians could "disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commission." 380 U. S., at 691. See *id.,* at 686, and n. 1.

it a criminal offense for "[a]ny person . . . to introduce goods, or to trade" without a license "in the Indian country, or on any Indian reservation." It is the existence of the Indian trader statutes, then, and not their administration, that pre-empts the field of transactions with Indians occurring on reservations.[4]

Nor is it relevant that appellant did not maintain a permanent place of business on the reservation. The Indian trader statutes and their implementing regulations apply no less to a nonresident person who sells goods to Indians on a reservation than they do to a resident trader. See 25 U. S. C. § 262 ("[a]ny person desiring to trade with the Indians on any Indian reservation" subject to regulatory authority of Commissioner of Indian Affairs); 25 U. S. C. § 263 ("President is authorized . . . to prohibit the introduction of goods . . . into the country belonging to any Indian tribe"); 25 U. S. C. § 264 (making it an offense for "[a]ny person" to introduce goods or to trade on a reservation without a license). Indeed, an implementing regulation expressly provides for the licensing of "itinerant peddlers," 25 CFR § 251.9 (b) (1979), who are by definition nonresidents, see 25 CFR § 252.3 (i) (1979). One of the fundamental purposes of these statutes and regulations—to protect Indians from becoming victims of fraud in dealings with persons selling goods—would be easily circumvented if a seller could avoid federal regulation simply by failing to adopt a permanent place of business on a reservation or by failing to obtain a federal license.

Since the transaction in the present case is governed by the Indian trader statutes, federal law pre-empts the asserted state tax. As we held in *Warren Trading Post, supra,* at

---

[4] In any event, it should be recognized that the transaction at issue in this case was subjected to comprehensive federal regulation. Although appellant was not licensed to engage in trading with Indians, the Bureau of Indian Affairs had approved both the contract of sale for the tractors in question and the tribal budget, which allocated money for the purchase of this machinery.

691, n. 18, by enacting these statutes Congress "has undertaken to regulate reservation trading in such a comprehensive way that there is no room for the States to legislate on the subject." It may be that in light of modern conditions the State of Arizona should be allowed to tax transactions such as the one involved in this case. Until Congress repeals or amends the Indian trader statutes, however, we must give them "a sweep as broad as [their] language," *United States* v. *Price,* 383 U. S. 787, 801 (1966), and interpret them in light of the intent of the Congress that enacted them, see *Wilson* v. *Omaha Indian Tribe,* 442 U. S. 653, 666 (1979); *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191, 206 (1978).[5]

The decision of the Supreme Court of Arizona is

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE POWELL, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS join, dissenting.

The question before us is whether the appellant is immune from a state tax imposed on the proceeds of the sale by it of farm machinery to an Indian tribe. The Court concludes that an affirmative answer is required by the rationale of *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685, a case that is similar in some respects to this one. While I agree that *Warren Trading Post* states the relevant legal principles, I cannot agree that those principles lead to the result reached by the Court in this case. Accordingly, I dissent.

In *Warren Trading Post,* the Court held that the State of Arizona may not impose the same tax involved here on the operator of a federally licensed retail trading business located on an Indian reservation. The Court determined that

---

[5] We decline appellee's invitation to re-examine our conclusion in *Warren Trading Post,* 380 U. S., at 691, n. 18, that the Buck Act, 4 U. S. C. §§ 105–110, does not permit States to tax transactions on Indian reservations.

the "apparently all-inclusive [federal] regulations and the statutes authorizing them," *id.,* at 690, under which the trader in that case had been licensed, were "in themselves sufficient to show that Congress has taken the business of trading on reservations so fully in hand that no room remains for state laws imposing additional burdens on traders," *ibid.*

As the Court recognizes, the circumstances of this case differ from those presented by *Warren Trading Post.* Specifically, the appellant here is not a licensed Indian trader and does not have a permanent place of business on the reservation. See *ante,* at 164. The Court considers these differences immaterial, however, apparently because, as it reads the relevant statutes, the appellant *could* have been subjected to regulation somewhat like that in *Warren Trading Post,* though in fact it was not. Thus the Court relies on 25 U. S. C. § 264, which makes it unlawful for "[a]ny person . . . to introduce goods, or to trade" without a license "in the Indian country, or on any Indian reservation."

Even assuming that the Court correctly reads the statutory language to reach anybody who sells goods "on any Indian reservation," I cannot understand why the Court ascribes to that fact the significance that it does. The question, after all, is not whether the appellant may be required to have a license, but rather, as the Arizona Supreme Court correctly believed, whether the state tax "runs afoul of any congressional enactments" dealing with the affairs of reservation Indians, *State* v. *Central Machinery Co.,* 121 Ariz. 183, 184, 589 P. 2d 426, 427 (1978). This Court has consistently recognized that " '[e]nactments of the federal government passed to protect and guard its Indian wards only affect the operation, within the [reservation,] of such state laws as conflict with the federal enactments,' " *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 483, quoting *United States* v. *McGowan,* 302 U. S. 535, 539.[1] With regard to the determinative issue

---

[1] As MR. JUSTICE POWELL observes in his dissenting opinion, *post,* at 172, the Court in *Moe* v. *Salish & Kootenai Tribes* rejected the contention that

whether Arizona's tax in this case is inconsistent with federal law, the Court says only that "[i]t is the existence of the Indian trader statutes . . . that pre-empts the field of transactions with Indians occurring on reservations," *ante,* at 165, and that those statutes must be given " 'a sweep as broad as [their] language,' " *ante,* at 166, quoting *United States* v. *Price,* 383 U. S. 787, 801.[2]

But the rationale of the decision in *Warren Trading Post, supra,* was not so simple as this. The grounds of that decision were twofold. First, as the Court today reiterates, a tax on the gross income of a licensed trader residing on the reservation could "disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable," *id.,* at 691. Second, the Court saw in that case no governmental justification to support the State's "put[ting] financial burdens on [the trader] or the Indians with whom it deals in addition to those Congress or the tribes have prescribed," *ibid.* Because Congress for nearly a century had "left the Indians . . . free to run the reservation and its affairs without state control," Arizona had been "automatically relieved . . . of all burdens for carrying on those same responsibilities," *id.,* at 690. That being so, the Court did not "believe that Congress intended to leave to the State the privilege of levying this tax," *id.,* at 691.

Neither of these considerations is present here. First, although the appellant was obliged to obtain federal approval of the sale transaction in this case, see 25 U. S. C. §§ 262, 264, it was not subjected to the much more comprehensive regulation that governs licensed traders engaged in a continuous course of dealing with reservation Indians. See 25 CFR

_____

the Indian trader statutes occupy the field so completely as to pre-empt all state laws affecting those who trade on the reservation with reservation Indians.

[2] The Court's construction of the trader statutes, in fact, sweeps far more broadly than their language, no portion of which indicates a congressional intention to immunize anybody from state taxation.

Part 251 (1979). In these circumstances, the Court's expressed belief that the minimal regulation to which the appellant was subject "leaves no room" for the state tax in this case strikes me as hyperbolic. Even were the appellant administratively required to possess a license, taxation of an isolated sale by it to the Indians simply would not jeopardize those federal and tribal interests involved in the thorough regulation of on-reservation merchants trading continuously with the Indians—the situation dealt with in *Warren Trading Post*. There the financial burdens of state taxation would have impaired the Commissioner's ability to prescribe "the kind and quantity of goods and the prices at which such goods shall be sold to the Indians," 25 U. S. C. § 261, and might have threatened the very existence of the resident trader's enterprise, on which the tribe depended for its essential commerce. No similar risks exist in a case such as this one, involving an isolated sales transaction. The viability of the seller may be assumed from its willingness to trade, and the reasonableness of the terms of sale may be guaranteed, as they were in this case, by the Commissioner's review of them. It is true that the prices paid by the Indians might be lower if the appellant is immune from the tax. But that is hardly relevant. The Court has on more than one occasion sustained state taxation of transactions occurring on Indian reservations, notwithstanding the fact that the economic burden of the tax fell indirectly on the Indian tribe or its members. See *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 151, 156–157; *Moe* v. *Salish & Kootenai Tribes, supra.* Cf. *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148.

Second, the Court inexplicably ignores the State's wholly legitimate purpose in taxing the appellant, a corporation that does business within the State at large and presumably derives substantial benefits from the services provided by the State at taxpayer's expense.[3] Aside from entering the reser-

---

[3] "The State also has a legitimate governmental interest in raising

vation to solicit and execute the contract of sale and to receive payment, circumstances that are certain to characterize all sales to reservation Indians after today's decision, the appellant conducts its affairs in all respects like any other business to which the State's nondiscriminatory tax concededly applies. Thus, quite unlike the circumstances in *Warren Trading Post,* the State in this case has not been relieved of all duties or responsibilities respecting the business it would tax. Yet, despite the settled teaching of the Court's decisions in this area that every relevant state interest is to be given weight, see *Washington* v. *Confederated Tribes of Colville Indian Reservation, supra; McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 171; cf. *White Mountain Apache Tribe* v. *Bracker, ante,* at 144, the Court does not even consider the State's valid governmental justification for taxing the transaction here involved.

It is important to recognize the limits inherent in the principles of federal pre-emption on which the *Warren Trading Post* decision rests. Those limits make necessary in every case such as this a careful inquiry into pertinent federal, tribal, and state interests, without which a rational accommodation of those interests is not possible. Had such an inquiry been made in this case, I am convinced the Court could not have concluded that Arizona's exercise of the sovereign power to tax its non-Indian citizens had been pre-empted by federal law.

MR. JUSTICE POWELL, dissenting in No. 78–1604 (*ante,* p. 160) and concurring in No. 78–1177 (*ante,* p. 136).

I write separately because I would distinguish *Central Machinery Co.* v. *Arizona State Tax Comm'n, ante,* p 160, from *White Mountain Apache Tribe* v. *Bracker, ante,* p. 136.

---

revenues, and that interest is likewise strongest when the tax is directed at [economic value created off of the reservation] and when the taxpayer is the recipient of state services." *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 157.

I agree with the Court that a non-Indian contractor continuously engaged in logging upon a reservation is subject to such pervasive federal regulation as to bring into play the preemption doctrine of *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685 (1965). But *Warren Trading Post* simply does not apply to routine state taxation of a non-Indian corporation that makes a single sale to reservation Indians. I therefore join the Court's opinion in *White Mountain Apache Tribe*, but I dissent from its decision in *Central Machinery*.

I

<em>Central Machinery</em>

*Warren Trading Post* held that Arizona could not levy its transaction privilege tax against a company regularly engaged in retail trading with the Indians upon a reservation. The company operated under a federal license, and it was subject to the federal regulatory scheme authorized by 25 U. S. C. §§ 261–264. "These apparently all-inclusive regulations," the Court concluded, "show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." 380 U. S., at 690.

The Court today is too much persuaded by the superficial similarity between *Warren Trading Post* and *Central Machinery*. The Court mistakenly concludes that a company having no license to trade with the Indians and no place of business within a reservation is engaged in "the business of Indian trading on reservations. . . ." 380 U. S., at 690. Although "[a]ny person" desiring to sell goods to Indians inside a reservation must secure federal approval, see 25 U. S. C. §§ 262, 264, the federal regulations—and the facts of this case—show that a person who makes a single approved sale need not become a fully regulated Indian trader. Even itinerant peddlers who engage in a pattern of selling within a reservation are merely "considered as traders" for purposes

of the licensing requirement. 25 CFR § 251.9 (b) (1979). "The business of a licensed trader," in fact, "must be managed by the bonded principal, who must habitually reside upon the reservation. . . ." 25 CFR § 251.14 (1979).[1] Since *Warren Trading Post* involved a resident trader subject to the complete range of federal regulation, the Court had no occasion to consider whether federal regulation also pre-empts state taxation of a seller who enters a reservation to make a single transaction.[2]

Our most recent cases undermine the notion that 25 U. S. C. §§ 261–264 occupy the field so as to pre-empt all state regulation affecting licensed Indian traders. The unanimous Court in *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 481–483 (1976), concluded that a State could require tribal retailers to prepay a tax validly imposed on non-Indian customers. Rejecting an argument based on *Warren Trading Post,* the Court concluded that federal laws " 'passed to protect and guard [the Indians] only affect the operation, within the [reservation], of such state laws as conflict with the federal enactments.' " 425 U. S., at 483, quoting *United States* v. *McGowan,* 302 U. S. 535, 539 (1938). In *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S.

_____

[1] The regulation dealing with itinerant peddlers was promulgated after the decision in *Warren Trading Post.* See 30 Fed. Reg. 8267 (1965). Thus, the regulations before the Court in *Warren Trading Post* required all licensed Indian traders to conduct their businesses under the management of a habitual resident upon the reservation. 25 CFR § 251.14 (1958),

[2] At oral argument, counsel for Central Machinery conceded that the State could have taxed the transaction in question if it had been completed at the firm's usual place of business. Tr. of Oral Arg. 7. Thus, Central Machinery's argument reduces to the proposition that the locus of the transaction is dispositive. Quite apart from the opportunities for tax evasion that it creates, this position is unsound. Persons who make an unauthorized sale to Indians upon a reservation can be prosecuted. 25 U. S. C. § 264; see *United States ex rel. Hornell* v. *One 1976 Chevrolet Station Wagon,* 585 F. 2d 978 (CA10 1978). But that certainly does not prove that all persons who make an authorized sale are subject to the pervasive regulation considered in *Warren Trading Post.*

134, 159–160 (1980), the Court holds that a State can require licensed traders to keep detailed tax records of their sales to both Indians and non-Indians. Cf. *Confederated Tribes* v. *Washington,* 446 F. Supp. 1339, 1347, 1358–1359 (ED Wash. 1978) (three-judge court).

Finally, unlike taxes imposed upon an Indian trader engaged in a continuous course of dealing within the reservation, the tax assessed against Central Machinery does not "to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians . . . except as authorized by Acts of Congress or by valid regulations promulgated under those Acts." *Warren Trading Post, supra,* at 691. In this case, the Bureau of Indian Affairs approved all aspects of the only sale Central Machinery made to the Gila River Indian Tribe. The contract price approved by the Bureau included costs attributable to the very tax that Central Machinery now seeks to recover. *Ante,* at 161–162. Thus, the State's tax did not interfere with "the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable. . . ." *Warren Trading Post, supra,* at 691. Since a seller not licensed to trade with the Indians must secure specific federal approval for each isolated transaction, there is no danger that ordinary state business taxes upon the seller will impair the Bureau's ability to prevent fraudulent or excessive pricing. To hold the seller immune from state taxes otherwise due upon a single transaction with the Indians gives the non-Indian seller a windfall or the Indian buyer an unwarranted advantage over all others who deal with the seller.

## II

### White Mountain Apache Tribe

*White Mountain Apache Tribe* presents a different situation. Petitioner Pinetop Logging Co. operates solely and continuously upon an Indian reservation under its contract

with a tribal enterprise. Pinetop's daily operations are controlled by a comprehensive federal regulatory scheme designed to assure the Indian tribes the greatest possible return from their timber. Federal officials direct Pinetop's hauling operations down to such details as choice of equipment, selection of routes, speeds of travel, and dimensions of the loads. *Ante,* at 146–148. Pinetop does all of the hauling at issue in this case over roads constructed, maintained, and regulated by the White Mountain Apache Tribe and the Bureau of Indian Affairs. The Bureau requires the Tribe and its contractors to repair existing roads and to construct new roads necessary for sustained logging. Pinetop exhausts a large percentage of its gross income in performing these contractual obligations. *Ante,* at 148.

Since the Federal Government, the Tribe, and its contractors are solely responsible for the roads that Pinetop uses, I "cannot believe that Congress intended to leave to the State the privilege of levying" road use taxes upon Pinetop's operations. See *Warren Trading Post,* 380 U. S., at 691. The State has no interest in raising revenues from the use of Indian roads that cost it nothing and over which it exercises no control. See *Washington* v. *Confederated Tribes, supra,* at 162–164.[3] The addition of these taxes to the road construction and repair expenses that Pinetop already bears also would interfere with the federal scheme for maintaining roads essential to successful Indian timbering. See 380 U. S., at

---

[3] The motor carrier license tax imposed by Ariz. Rev. Stat. Ann. § 40–641 (Supp. 1979) is a tax on the privilege of engaging in a business that makes inordinate use of public roads. See *Purolator Security, Inc.* v. *Thorneycroft,* 116 Ariz. 394, 396–397, 569 P. 2d 824, 826–827 (1977); *Campbell* v. *Commonwealth Plan, Inc.,* 101 Ariz. 554, 557, 422 P. 2d 118, 121 (1966). All revenues from this tax are earmarked for maintenance and improvement of the State's highways. Ariz. Rev. Stat. Ann. § 40–641 (C) (Supp. 1979). The fuel use excise tax imposed by Ariz. Rev. Stat. Ann. § 28–1551 (Supp. 1979) is "for the purpose of partially compensating the state for the use of its highways." § 28–1552 (Supp. 1979).

691. The Tribe or its contractors would pay twice for use of the same roads. This double exaction could force federal officials to reallocate work from non-Indian contractors to the tribal enterprise itself or to make costly concessions to the contractors. I therefore join the Court in concluding that this case "is in all relevant respects indistinguishable from *Warren Trading Post.*" *Ante,* at 153.