855 P.2d 127

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT, Defendant–Petitioner,**

v.

**LAGUNA INDUSTRIES, INC., and Raytheon Service Company, Plaintiffs–Respondents.**

No. 20855.

Supreme Court of New Mexico.

June 8, 1993.

Tom Udall, Atty. Gen., Frank D. Katz, Sp. Asst. Atty. Gen., Santa Fe, for petitioner.

Nordhaus, Haltom, Taylor, Taradash & Frye, Wayne Bladh, Santa Fe, for respondents.

*OPINION*

FRANCHINI, Justice.

By opinion dated October 5, 1992, the Court of Appeals affirmed the trial court's summary judgment in favor of Laguna Industries, Inc. (Laguna) and against the New Mexico Taxation and Revenue Department (Department). *See Laguna Indus., Inc. v. New Mexico Taxation & Revenue Dep't,* 114 N.M. 644, 845 P.2d 167 (Ct.App. 1992). On November 19, 1992, we granted certiorari to determine whether the Indian trader statutes[1] preempt the imposition of gross receipts tax[2] on receipts for non-Indian services rendered to an Indian tribal entity on the reservation.

After a careful review of the majority and dissenting opinions, briefs, and all other pertinent material, we affirm the Court of Appeals. The majority determined that "trade" as used in the Indian trader statutes includes trade in services and therefore, the preemption analysis of *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), and *Central Machinery Co. v. Arizona State Tax Comm'n,* 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980), applied to the transaction at issue. *See Laguna Industries,* 114 N.M. at 654, 845 P.2d at 177. We adopt the majority opinion and comment only to emphasize what we consider an important consideration in the majority's analysis: that the purpose of the Indian trader statutes supports the interpretation that "trade" includes trade in services.

---

1. 25 U.S.C. §§ 261 to 264 (1988).

2. NMSA 1978, §§ 7–9–1 to –82 (Repl.Pamp.1990 & Cum.Supp.1992).

The facts are set forth in detail by the Court of Appeals. *See Laguna Industries*, 114 N.M. at 646–47, 845 P.2d at 168–69. We briefly summarize. Raytheon Service Company (Raytheon) contracted with Laguna, a wholly owned corporation of the Pueblo of Laguna, to perform technical, training, and management assistance to enable Laguna to obtain federal contracts from the Department of Defense (DOD). The underlying case is a claim for refund of state gross receipts tax paid by Raytheon on income received for training and other services it performed at Laguna Pueblo for Laguna. *See* NMSA 1978, § 7–1–26 (Repl.Pamp.1990). Raytheon passed the cost of the gross receipts tax on to Laguna and assigned its right to any tax refund to Laguna.

■ The Department throughout the litigation has conceded that transactions which come within the scope of the Indian trader statutes are not taxable by the State based on *Warren Trading Post* and *Central Machinery*. The question presented to the Court of Appeals was whether "trade" as used in the statutes includes trade in services. The Department contends that it applies only to trade in goods. In a well reasoned, carefully thought out opinion, the majority rejected the Department's narrow interpretation of "trade" on several interrelated grounds: (1) The Indian trader statutes must be construed broadly and liberally in favor of the Indians; (2) Excluding service transactions from the statutes would not be consistent with the purposes of statutes to protect Indians from fraud and imposition; (3) Service transactions were a significant part of the American economy when the first Indian trader statutes were enacted; (4) The term "trade" in other similar contexts has not been interpreted as limited to goods; (5) The seminal Indian law decision of *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 556–57, 8 L.Ed. 483 (1832) interpreted the Indian Trade and Intercourse Acts as regulating all intercourse with the Indians in their territory; (6) The 1834 version included express references to regulation of "boatmen" and "interpreters" who dealt in services; and (7) Department of Interior

regulations have expressly interpreted the Indian trader statutes and related acts to include trade in services. *See Laguna Industries*, 114 N.M. at 649–50, 845 P.2d at 172–75.

■ To the majority opinion we would only emphasize the following on the purpose of the Indian trader statutes. The Indian trader statutes were passed for the benefit of the dependent Indian tribes and must be liberally construed with doubtful expressions being resolved in favor of the Indians. *Ashcroft v. United States Dept. of the Interior*, 679 F.2d 196, 198 (9th Cir.1982). Until they are repealed or amended, "we must give them 'a sweep as broad as [their] language,' and interpret them in light of the intent of the Congress that enacted them." *Central Machinery*, 448 U.S. at 166, 100 S.Ct. at 2596 (citations omitted). Thus, we look to the object sought to be accomplished by the legislatures. *See Lopez v. Employment Sec. Div.*, 111 N.M. 104, 105, 802 P.2d 9, 10 (1990).

One noted scholar has described the trader statutes as shaping, through a series of laws, our government's Indian policy. Francis P. Prucha, *American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts, 1790–1834*, 2 (Bison Book ed. 1970) (1962). A major aspect of that policy was controlling the problem resulting from the presence of Indians in the "path of aggressive and land-hungry whites." *Id.* at 3.

The goal of American statesmen was the orderly advance of the frontier. To maintain the desired order and tranquility it was necessary to place restrictions on the contacts between the whites and the Indians. The intercourse acts were thus restrictive and prohibitory in nature—aimed largely at restraining the actions of the whites and providing justice to the Indians as the means of preventing hostility.

*Id.*

The United States addressed the question of trade with the surrounding Indian nations in the very first Congress. *See* Act

of July 22, 1790, ch. 33, 1 Stat. 137 (1856). That statute required a federal license before any person could be "permitted to carry on any trade or intercourse with the Indian tribes." Section 1. From the very beginning, Congress asserted the power to control through licensing all trade and other contacts with the Indians.

The 1790 act had a two-year "sunset" provision, and Congress adopted similar acts again in 1793, 1796, 1799 and 1802.[3] These acts became more detailed as years passed, until Congress adopted the final enactment in the series of Acts "to regulate trade and intercourse with the Indian tribes." Indian Trade and Intercourse Act of June 30, 1834, ch. 161, 4 Stat. 729 (1850). The 1834 Act demonstrates an attempt by Congress to control every aspect of contact between the United States and the Indian nations. Its detailed and comprehensive provisions manifested the intent of the Federal Government to assert "through statutes and treaties a sweeping and dominant control over persons who wished to trade with Indians and Indian tribes." *Warren Trading Post*, 380 U.S. at 687, 85 S.Ct. at 1244. The objectives of the statutes were "to prevent 'fraud and imposition' upon [the Indians]," *Central Machinery*, 448 U.S. at 163, 100 S.Ct. at 2595. These objectives support the majority opinion's holding that the Indian trader statutes apply to the sale of services as well as the sale of goods. The narrow interpretation of "trade" urged by the Department would tend to defeat these objectives. Thus, for example, under Section 3 of the 1834 Act (25 U.S.C. § 263), if the President declares an embargo on certain goods, no trader to any other tribe "shall, so long as such prohibition may continue, trade with any Indians" of the embargoed tribe. Under the Department's interpretation, both licensed traders and unlicensed individuals would be free to sell "services" to the tribe during the embargo, presumably including gunsmith services. It is more reasonable to conclude that Congress intended to allow the President to cut off all trade with the tribe, including service transactions, in order to enforce an embargo on specified goods.

The Department's narrow reading of Section 4 of the 1834 Act (25 U.S.C. § 264) also would defeat the efforts of Congress to monopolize all contacts with the Indians. Under the Department's interpretation, any person would be free to go into Indian country and engage in business transactions with the Indians without a license as long as those transactions did not involve the sale of goods. Those individuals would not be violating Section 4 because, according to the Department, their activity does not amount to "trade." We disagree because we do not believe Congress intended to leave this category of intercourse with the Indians wholly unregulated.

Nothing in the legislative history of the 1834 Act supports the Department's attempt to interpret "trade" narrowly. The House Report states the relationship between the United States and the tribes "is now that of the strong to the weak, and demands at our hands a more liberal policy, as well directed to promote their welfare as our political interests." H.R.Rep. No. 474, 23rd Cong., 1st Sess., at 11 (1834). The Report noted that if a United States citizen desires "*to trade* or *to reside* in the Indian country for any purpose whatever, a license for that particular purpose is required." *Id.* (Emphasis in original.) The Report further explained that the Indians had been the victims of "fraud and imposition" by licensed traders, and that additional regulations were necessary for the protection of the Indians. *Id.* The proposed bill therefore expanded on the government's power to refuse licenses to persons of bad character or those who should not be permitted to reside in Indian country for any other reason. *Id.* In Section 2 of the 1834 Act, Congress intended to strengthen the regulation of "trade with any of the Indians." The Department has suggested no policy reason to leave all service transactions unregulated in that Act.

**3.** Act of March 1, 1793, ch. 19, 1 Stat. 329; Act of May 19, 1796, ch. 30, 1 Stat. 469; Act of March 3, 1799, ch. 46, 1 Stat. 743; Act of March 30, 1802, ch. 13, 2 Stat. 139.

**556**

The other two existing Indian trader statutes, 25 U.S.C. §§ 261 and 262, were adopted in 1876 and 1901, respectively. Neither section reveals an attempt by Congress to narrow the scope of the trader statutes. "Courts that have reviewed § 261 confirm that the thrust of the section is to protect Indians from unethical business practices." *Rosebud Sioux Tribe v. United States Bur. of Indian Affairs,* 714 F.Supp. 1546, 1557 (D.S.D.1989). There is virtually no legislative history for the 1901 Act. It is, however, the most recent statement of Congress on the question of Indian trading, and is phrased in the most general and sweeping language. Congress referred broadly to "trade with the Indians," not to "goods," and authorized the Commissioner to adopt regulations limited only by the requirement they be "for the protection of said Indians." 25 U.S.C. § 262.

In light of our comments on the purpose of the trader statutes and the Court of Appeal's exhaustive examination of the text of those statutes, their historical development, the legislative history of amendments and related legislation, Interior Department regulation interpreting those statutes, and judicial opinions establishing the appropriate rules for construing them, we adopt and affirm the district court and the Court of Appeals majority's holding that "trade" as used in the Indian trader statutes includes trade in services. Therefore, the Department's taxation of income received from services rendered to the tribal enterprise on the reservation was preempted by federal law. Affirmed.

**IT IS SO ORDERED.**

RANSOM, C.J., and BACA, J., concur.