## THE SLOOP ACTIVE

*v.*

## THE UNITED STATES.

1812.

Feb. 19th.

*Present....All the judges.*

THIS was an appeal from the sentence of the Circuit Court of the District of Connecticut which affirmed that of the District Court condemning the sloop *Active* and Cargo.

The libel stated that the sloop *Active* was an American vessel duly enrolled and licensed for the cod-fishery on the 5th of July, 1808, and had given the bond required to be given by such vessels under the several acts of Congress laying and enforcing the embargo; and had a permit to depart and be employed in the cod fishery.

That in the night between the 4th and 5th of July, 1808, at the port of New London, there was secretly and unlawfully laden on board her, a cargo consisting of barrels of beef, fish, butter, &c., without the knowledge and not under the inspection of a revenue officer, with intent unlawfully to proceed with the vessel and cargo to some place without the port, harbor and district of New London. That the vessel so laden, left her place at the wharf in the port of New London, in the night, without the knowledge of any custom house officer, without a license or permit, and without any custom house papers, and departed therefrom and out of the said port, and proceeded on her said intended unlawful voyage to some place to the custom-house officers unknown. That the cargo was worth more than 600 dollars. That the vessel was unlawfully employed in trade other than that for which she was licensed.

The facts of the case appeared to be as stated in the libel, except that the vessel was seized in the act of leaving the port, but before she had gone out of the port; and that Gates, the owner of the greater part of the cargo, was neither master, owner nor mariner of the vessel.

The departure of a vessel from the wharf of a port, and proceeding a mile and an half therefrom with intent to go to sea, is not a departure from the port, within the meaning of the 3d section of the supplementary embargo act of January 9th, 1808, if the vessel had not actually gone out of the port before seizure. A licensed fishing vessel is liable to forfeiture [under the 32d section of the act of the 18th of February, 1793, for enrolling & licensing vessels] for sailing, laden with goods with intent to carry them to another place, without a license therefor, although the goods are wholly of domestic growth and manufacture and not liable to any duty. But such cargo is

PITKIN and DANA, for the Appellants.

Three questions arise in this cause.

1. Whether the vessel and cargo were forfeited by being laden contrary to the 2d section of the act of 25th *April*, 1808—*vol.* 9, *p.* 146, which declares that " no " vessel shall receive a clearance, unless the lading " shall be made hereafter under the inspection of the " proper revenue officers, subject to the same restric- " tions, regulations, penalties and *forfeitures*, as are " provided by law for the inspection of goods, wares " and merchandize imported," &c.

not liable to
forfeiture un-
less it belong
to the master,
owner, or a
mariner, of the
vessel.

2. Whether she departed from a port of the United States without a clearance or permit, contrary to the 3d section of the act of the 9th *of January*, 1808—*vol.* 9, *p.* 11.

3. Whether she was employed in any other trade than that for which she was licensed, contrary to the 32d section of the act of *February* 18th, 1̀ ′, for en- rolling and licensing vessels—*vol.* 2, *p.* 193.

1. Upon the first question, nothing will be added to the arguments urged in the case of the *Paulina*. (*Ante p.* 55.)

The only penalty, under that act, for lading without the inspection of a revenue officer, is the denial of a clearance.

There was no law then in force to punish the *intent* to violate the embargo. The act of January 9th, 1809, (*vol.* 9, *p.* 184.) first made it penal to lade a vessel with that *intent*.

The libel does r . charge the intent to be to export the cargo to any *foreign* place, which was the evil in- tended to be guarded against by all those laws. It was not unlawful to transport domestic goods from one dis- trict to another in the United States. She had given bond according to the provisions of the act of *January* 9th, 1808—(*vol.* 9, *p.* 11) not to proceed to any foreign port or place.

SLOOP
ACTIVE
*v.*
U. STATES.

The 5th section of the act of January 9th, 1809, (commonly called the *enforcing* act) first made the vessel liable to forfeiture for lading without a permit. This is a legislative confession that the law was not so before. It sanctions our construction of the act of the *25th of April*, 1808.

2. It appears from the evidence that the vessel was seized within the port, about a mile and an half from the wharf.

She did not " *depart from*" the port, and is therefore not liable to forfeiture under the 3d section of the act of January 9th, 1808.

3. Was the *Active* engaged in any trade [other than that for which she was licensed] within the meaning of the enrolling act?

By the 32d section of that act, *vol.* 2, *p.* 193, it is declared, " that if any licensed vessel shall be employed " in any other trade than that for which she is licensed, " such vessel, with her tackle, apparel and furniture, " and the cargo found on board her, shall be forfeited."

The object of this provision evidently was to prevent smuggling, and other frauds upon the revenue. This is evident from various expressions and provisions in other parts of the act.

Thus the 33d section provides that if the cargo belong to a person other than the master, owner, or mariners of the vessel so trading, and if the duties on the cargo have been paid or secured according to law, such cargo shall not be forfeited.

The reason is, that the revenue cannot be defrauded if the duties have been paid. If then this vessel had been laden with foreign goods, and the duties had been paid, they would not have been forfeited; *a fortiori*, would they be exempt from forfeiture, being American produce and not liable to any duty.

So, in the 4th section of the same act, *vol.* 2, *p.* 171, bond is to be given to pay to the United States 1,000

dollars in case it shall appear that the vessel has been employed in any trade, *whereby the revenue of the United States has been defrauded*, during the time the license was in force; and the master is to take an oath that she shall not be employed in any trade whereby the revenue may be defrauded.

By the 5th section, it is declared that no license shall be in force for carrying on any other business or employment than that for which the vessel is specially licensed; and by the 6th section, every vessel found trading between district and district, or between different places in the same district, without being enrolled and licensed, if laden with goods, *the growth or manufacture of the United States only,* (distilled spirits excepted) or in ballast, shall pay *foreign* fees and tonnage, but if she has any articles of foreign growth or manufacture, or distilled spirits, the vessel and cargo shall be forfeited.

The license which the sloop *Active* had for the cod fishery not being in force for the coasting trade, she was found trading between different places in the same district without a license, and therefore was within the 6th section of the act; and being laden only with domestic produce, was only liable to pay foreign fees and tonnage.

By the 8th section, if a vessel, enrolled and licensed, shall proceed on a foreign voyage, without giving up her enrolment and license, and being registered, such vessel, and the goods *so imported therein*, shall be liable to forfeiture. Under this section the vessel must actually make the foreign voyage and import goods before she can be forfeited.

The 12th section authorizes a change of the master, and requires the new master, or the owner, to make oath that the vessel shall not, while the license continues in force, be employed in any manner *whereby the revenue may be defrauded.*

By the 21st section, a licensed fishing vessel trading to a foreign port without a license or permit therefor, is only liable to forfeiture in case she be found within three leagues of the coast with foreign goods on board to the value of 500 dollars. Domestic goods found on

SLOO
ACTIVE
*v.*
U.STATES.

SLOOP
ACTIVE
*v.*
U. STATES.

board are not liable to forfeiture. It cannot therefore be supposed that the legislature intended to render such a vessel liable to forfeiture, for carrying domestic goods, upon which no duties were payable, from one part of a port to another.

The act of taking on board certain domestic goods and *carrying* them from one part of the port to another is not such a *trade* as was contemplated in the 32d section of the act. Such a construction would be contrary to the spirit of the whole act.

All that can be said is, that she took in the goods with intent to trade; but this is not trading. Such an intent is not punishable.

DALLAS, *Attorney of the United States for the District of Pennsylvania, and* PINKNEY, *Attorney General of the United States—for Appellees.*

The parties engaged in this transaction were conscious that it was an unlawful business. This vessel was confined by law to the cod fishery. She could not lawfully carry on the coasting trade.

She was laden in the night, and was towing out of the harbor when she was seized. Gates, who claims the cargo, appears to be master for that voyage—at least he had the use of the vessel, and was on board and there was no other master.

1. The first enquiry is, whether this vessel is liable to forfeiture under the embargo law, and

2. Whether she is liable under the enrolling and licensing act.

1. She departed from a port of the United States without a clearance or permit, contrary to the act of *January 9th,* 1808—*vol. 9, p. 11. § 3.*

To depart from a port, does not mean to go out of the port. She departed from the port when she set sail to leave the port—when she broke ground. This is the construction always given to policies, when the insurance is *from* (not *at* and from) a certain port.

2. The protection of the revenue was not the only object of the prohibition to use the license for another purpose than that for which it was given. It was material to know in what kind of trade every vessel was engaged. All the sections which have been cited show that it was the intention of the legislature to prohibit the vessel from engaging in any other employment than that for which she was licensed, although such employment should not in any manner affect the revenue. It is a plain and express prohibition under the penalty of forfeiture of vessel and cargo—and it is unnecessary to enquire into the motives of the legislature.

She was engaged in the business of carrying goods from one place to another—and this was an employment or trade for which she had no license. She was as much engaged in trade at the inception as she would have been at the consummation of the voyage. It was not necessary that she should have finished the voyage, or have been engaged in buying and selling.

*February 26.*

MARSHALL, *Chief Justice,* delivered the opinion of the court as follows:*

The sloop Active, a vessel licensed for the fishing trade, was laden, in the night of the 4th of July in the year 1808, in the port of New London, and was seized by the revenue officer, after having left the wharf without a clearance, under circumstances which justify a belief that she was about to proceed on a foreign voyage in violation of the acts laying an embargo. The vessel and cargo were libelled as having been forfeited under the laws of the United States, and were both condemned in the District Court, which sentence was affirmed in the Circuit Court.

This sentence is supported on the part of the United States under the 3d section of the supplementary act to the act laying an embargo, and the 32d section of the act for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries.

* Judge Todd was absent in consequence of indisposition.

SLOOP
ACTIVE
v.
U. STATES.

This court is of opinion, that however criminal the intentions of those on board the Active might have been, neither the vessel nor cargo were forfeited under the 3d section of the " act supplementary to the act, entitled an act laying an embargo on all ships and vessels in the ports and harbors of the United States," because she appears to have been seized in port; and a departure from port without a clearance was necessary to consummate the offence.

The case is undoubtedly within the words of the 32d section of the enrolling and licensing act. The Active was a licensed vessel employed in a trade other than that for which she was licensed.

The argument that this act was intended merely to secure the revenue, and that its provisions do not contemplate a vessel laden with domestic produce not subject to duty, has been urged with great force and certainly derives much strength from the various sections of the act which have been quoted. But the words of the 32d section are explicit, and although other preceding sections furnish much reason for believing that a forfeiture in a case where the revenue could not be defrauded, might not be contemplated by the legislature, yet they are not so expressed as to control the 32d section. The Active and her cargo, therefore, must be considered as forfeited, except so far as they come within the 33d section.

That section is in these words: " Provided nevertheless, and be it further enacted, That in all cases " where the whole or any part of the lading, or cargo " on board, any ship or vessel, shall belong, *bona fide*, " to any person or persons other than the master, own- " er, or mariners, of such ship or vessel, and upon " which the duties shall have been previously paid or " secured, according to law, shall be exempted from " any forfeiture under this act, any thing therein con- " tained to the contrary notwithstanding."

In this case the libel states, that      Billings and Morgan were owners of the vessel, and a certain     Gates owner of the cargo   A claim is filed by Billings and Morgan for the vessel and part of

the cargo, and by Gates for the residue of the cargo. It appears, then, both from the libel and claim, that a part of the cargo did " belong, *bona fide*, to a person other than the master, owner or mariners of the ship or vessel." This part of the cargo comes completely within that part of the description which relates to the ownership of the property. But the goods on board being liable to no duty, the duties could not have been previously paid or secured.

The court considers this section as manifesting a clear intention in the legislature to exempt from forfeiture a cargo not belonging to the owner, master or mariners, provided that cargo was not liable to duties. Whether this condition was produced by a previous payment of duties, or by a perfect exemption from duties, must be immaterial. Duties cannot be paid or sesured, according to law, on goods not liable, by law, to duty. The legislature must be understood, when saying " upon which the duties have been previously paid or secured according to law," to mean, " upon which the duties, *if any*, have been previously paid," &c.

It is the opinion of the court, that the sentence of the Circuit Court be *reversed* as to so much of the cargo of the sloop Active as is claimed as the property of Gates, and be *affirmed* as to the vessel and the residue of the cargo.

And it is directed to be certified that there was probable cause of seizure.