845 P.2d 167

**LAGUNA INDUSTRIES, INC., and Raytheon Services Company, Plaintiffs–Appellees,**

v.

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT, Defendant–Appellant.**

No. 12635.

Court of Appeals of New Mexico.

Oct. 5, 1992.

Certiorari Granted Nov. 19, 1992.

Wayne H. Bladh, Nordhaus, Haltom, Taylor, Taradash & Frye, Santa Fe, for plaintiffs-appellees.

Tom Udall, Atty. Gen., Frank D. Katz, Sp. Asst. Atty. Gen., Santa Fe, for defendant-appellant.

## OPINION

APODACA, Judge.

The New Mexico Taxation and Revenue Department (the Department) appeals from an order of the district court granting summary judgment to Raytheon Services Industry (Raytheon) and Laguna Industries, Inc., (Laguna) and denying the Department's own motion for summary judgment.

The order required the Department to refund gross receipts taxes paid by Raytheon on services performed for Laguna on the Laguna Pueblo (the Pueblo), an Indian reservation. The primary issue on appeal is whether the Indian trader statutes, 25 U.S.C. §§ 261 to 264 (1988), preempt the Department's authority to impose a gross receipts tax on Raytheon. Under a second issue, in support of its argument against the district court's denial of the Department's motion for summary judgment, the Department argues that no *other* federal statutes preempt state taxation on the services rendered.

The United States Supreme Court, in *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), and *Central Machinery Co. v. Arizona State Tax Commission*, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980), held that the Indian trader statutes preempted a similar tax in connection with transactions involving a sale of *goods*. We hold that the Indian trader statutes govern trade in services as well as trade in goods. The Department concedes that if we so interpret those statutes, the holdings of *Warren Trading Post* and *Central Machinery* compel the conclusion that the Indian trader statutes preempt the taxes imposed by the Department on Raytheon. Because we conclude that the statutes govern trade in services, it becomes unnecessary for us to address the Department's second issue to determine whether other federal legislation has preempted the Department's authority to impose the tax. We affirm the district court's decision.

BACKGROUND

1. *Facts.*

Laguna Industries, Inc., is a New Mexico corporation wholly owned by the Pueblo of Laguna, an Indian tribe organized under the Indian Reorganization Act, 25 U.S.C. § 476 (1988 & Supp.1992). In the early 1980s, the Pueblo sought to invest capital accumulated from uranium mining operations and to find employment for tribal members who were unemployed because of the decline of the uranium industry. To

accomplish this purpose, the Pueblo incorporated Laguna with the goal of obtaining federal contracts from the Department of Defense (DOD). To assure DOD that Laguna would be competent to handle these contracts, Laguna contracted with Raytheon, a major defense contractor, for technical, training, and management assistance.

From the Pueblo itself, Laguna received capital investment, a line of credit, and the use of a Pueblo-owned building. Laguna also received assistance, including grants, from various federal programs, including the Administration for Native Americans (ANA) within the Health and Human Services Department, the Small Business Administration (SBA), DOD, the Bureau of Indian Affairs (BIA), and Congress.

Some of the funds for the establishment of Laguna came from an ANA economic development grant of $655,140 to the Pueblo, conditioned on the Pueblo's receiving a DOD contract under the Buy Indian Program. Other funds were a BIA grant of $500,000, matching funds from the Pueblo of $900,000, a line of credit of $1,500,000 from the Pueblo, a loan from the Pueblo of $127,000, a Pueblo-owned building valued at $1,600,000, and federal funding under the Job Training Partnership Act, 29 U.S.C. §§ 1501 to 1781 (1988) (JTPA), that totalled $147,344.

For more than two years, Raytheon employees worked with Laguna employees on the reservation to provide technical assistance in setting up and operating the business and ensuring quality work. Laguna paid Raytheon from the ANA grant, the Pueblo line of credit and Laguna's operating profits, the BIA grant, and the JTPA funding. The Raytheon employees lived in Albuquerque and commuted daily to the reservation. Raytheon paid gross receipts tax on its receipts from the contract with Laguna and passed on the cost of those taxes to Laguna. It assigned its right to any tax refund to Laguna.

No New Mexico governmental agency made any capital contribution to Laguna or contributed any funds to pay Raytheon. However, most Laguna employees were educated in New Mexico schools. Raytheon employees lived in Albuquerque and used the roads and other services there. State professional licensing boards ensured the competency of the architects and builders of the Laguna building, the banks and insurance companies Laguna used, and the attorneys handling the litigation.

### 2. *Procedural history.*

In 1988, Raytheon and Laguna filed a claim for the refund of $53,750.86 paid by Raytheon to the Department from March 1986 through May 1988. The Department took no action on the claim within 120 days. Raytheon and Laguna then filed an action in district court pursuant to NMSA 1978, Section 7–1–26(A) (Repl.Pamp.1990), challenging the Department's failure to refund the tax. The parties filed cross motions for summary judgment. The district court granted Raytheon and Laguna's motion and denied the Department's motion, ruling that, as a matter of law, the sale of services to the tribe was "trading" under the Indian trader statutes. On that basis, the district court concluded that the Indian trader statutes preempted the state's authority to impose the tax on Raytheon and ordered the state to refund the taxes paid, together with interest and costs.

### 3. *The state tax.*

The Gross Receipts and Compensating Tax Act, NMSA 1978, §§ 7–9–1 to –82 (Repl.Pamp.1990 & Supp.1991), provides for the imposition of a gross receipts tax on any person engaging in business in this state based upon the privilege of engaging in business within New Mexico. § 7–9–4(A). The tax is imposed on the sale of services performed in New Mexico. § 7–9–3(F).

### 4. *The Indian trader statutes.*

The Indian trader statutes, 25 U.S.C. §§ 261 to 264, state:

§ 261. Power to appoint traders with Indians

The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations

as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.

§ 262.  Persons permitted to trade with Indians

Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians.

§ 263.  Prohibition of trade by President

The President is authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe, and to direct all licenses to trade with such tribe to be revoked, and all applications therefor to be rejected. No trader to any other tribe shall, so long as such prohibition may continue, trade with any Indians of or for the tribe against which such prohibition is issued.

§ 264.  Trading without license; white persons as clerks

Any person other than an Indian of the full blood who shall attempt to reside in the Indian country, or on any Indian reservation, as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $500: *Provided,* That this section shall not apply to any person residing among or trading with the Choctaws, Cherokees, Chickasaws, Creeks, or Seminoles, commonly called the Five Civilized Tribes, residing in said Indian country, and belonging to the Union Agency therein: *And provided further,* That no white person shall be employed as a clerk by any Indian trader, except such as trade with said Five Civilized Tribes, unless first licensed so to do by the Commissioner of Indian Affairs, under and in conformity to regulations to be established by the Secretary of the Interior.

The United States Supreme Court examined the history of the Indian trader statutes in *Warren Trading Post.* The Court stated that "from the very first days of our Government, the Federal Government * * * had exercised through statutes and treaties a sweeping and dominant control over persons who wished to trade with Indians and Indian tribes." *Warren Trading Post,* 380 U.S. at 686–87, 85 S.Ct. at 1243–44 (footnotes omitted). The Court continued, stating that "[s]uch comprehensive federal regulation of Indian traders has continued from that day to this." *Id.* at 688, 85 S.Ct. at 1244. The Supreme Court stated that the Commissioner of Indian Affairs, acting under the authority granted to him under Sections 261 and 262, had:

> promulgated detailed regulations prescribing in the most minute fashion who may qualify to be a trader and how he shall be licensed; penalties for acting as a trader without a license; conditions under which government employees may trade with Indians; articles that cannot be sold to Indians; and conduct forbidden on a licensed trader's premises. He has ordered that detailed business records be kept and that government officials be allowed to inspect these records to make sure that prices charged are fair and reasonable; that traders pay Indians in money; that bonds be executed by proposed licensees; and that the governing body of an Indian reservation may assess from a trader "such fees, etc., as it may deem appropriate."

*Id.* at 689–90, 85 S.Ct. at 1245 (footnotes omitted). Present regulations can be found at 25 C.F.R. Parts 140 and 141 (1991). "These apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." *Warren Trading Post,* 380 U.S. at 690, 85 S.Ct. at 1245. Later, in *Central Machin-*

*ery,* the Supreme Court expanded upon the holding of *Warren Trading Post,* concluding that, in enacting the Indian trader statutes and the regulations under them, "the Federal Government has comprehensively regulated trade with Indians to prevent 'fraud and imposition' upon them." *Central Mach. Co.,* 448 U.S. at 163, 100 S.Ct. at 2594–95. *Central Machinery* held that it was the existence of the Indian trader statutes themselves, and not their administration, that preempted the imposition of the tax. *Id.* at 165, 100 S.Ct. at 2596. Thus, although the trader was not licensed to engage in trading with Indians, as required by the Indian trader statutes and the regulations under them, the Court held that imposition of the tax was nonetheless preempted. *Id.* at 164–65, 100 S.Ct. at 2595–96. The Court also considered it irrelevant that the sale was made to a tribal enterprise, as occurred in this appeal, rather than directly to the tribe itself. *Id.* at 164 n. 3, 100 S.Ct. at 2595 n. 3.

## DISCUSSION

The Department concedes that the Supreme Court's decisions in *Warren Trading Post* and *Central Machinery* are still good law and that, under them, the Indian trader statutes preempt state taxes on activities within the scope of the statutes.[1] We should also note that the Department, in arguing its second issue (which, as we previously noted, we need not address), although contending that *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209, (1989), marks "a significant change of direction of the Supreme Court on its preemption analysis," concedes that that recent case did not overrule *Warren Trading Post* or *Central Machinery.* Additionally, *Cotton Petroleum* did not concern itself with the Indian trader statutes.[2]

■■■ The dissent maintains that the district court's decision was not proper in a summary judgment posture. Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. SCRA 1986, 1–056(C) (Repl.1992). Under the facts of this appeal, the facts are not in dispute; the issue is the proper interpretation of the relevant statutes. Interpretation of a statute is a question of law. *See Carpenter v. Arkansas Best Corp.,* 112 N.M. 1, 2, 810 P.2d 1221, 1222 (1991). Additionally, the legal effect of undisputed facts is a question of law. *Westgate Fami-*

---

1. The dissent agrees with the recent observation of the Arizona Court of Appeals that "the holding in *Warren Trading Post* did not establish that federally licensed Indian traders could not be subjected to state tax." *State ex rel. Dept. of Rev. v. Dillon,* 170 Ariz. 560, 826 P.2d 1186, 1193 (Ct.App.1991), *review den.,* (Ariz.1992). However, the dissent ignores the sentence immediately following this statement, in which the Arizona Court of Appeals recognized that, under *Warren Trading Post,* "state taxation of Indian traders is preempted only to the extent of their receipts from reservations sales to reservation Indians." *Id. Dillon* involved a tax imposed on the trader's sales to *non-Indians,* thereby making *Warren Trading Post* and *Central Machinery* inapplicable. In contrast, the facts of this appeal involve a tax imposed on the receipts of a sale to reservation Indians on the reservation. As recognized by *Dillon,* under these facts the holdings of *Warren Trading Post* and *Central Machinery* are applicable.

   The dissent would remand for additional fact-finding so that the tribal, federal, and state interests can be weighed, despite its apparent conclusion that services are not governed by the Indian trader statutes. If services were not intended by Congress to be included in the Indian

   trader statutes, it necessarily follows that such federal legislation does not apply to the transactions at issue in this appeal. If the legislation does not apply, then there is no implied preemption issue. The particular examination and balancing of the various federal, state, and tribal interests, which the dissent suggests be performed on remand, thus become unnecessary because there is no federal legislation to preempt the state taxes. Remand is also unnecessary in light of the fact that the U.S. Supreme Court has already balanced these interests in *Warren Trading Post.* In that case, it concluded that, when a sale is made to reservation Indians on the reservation, the state tax on the receipts of the sale is preempted. *Warren Trading Post,* 380 U.S. at 691–92, 85 S.Ct. at 1246.

2. The dissent claims we do not give "proper weight to the teachings of *Cotton Petroleum,*" Because *Cotton Petroleum* did not involve the same statutes as *Warren Trading Post* and *Central Machinery,* the preemption analysis contained in those two cases would not have been applicable. Thus, it is not surprising that the majority in *Cotton Petroleum* would not have found *Warren Trading Post* and *Central Machinery* controlling.

*lies v. County Clerk,* 100 N.M. 146, 148, 667 P.2d 453, 455 (1983). Any necessary balancing, whatever its outcome, could also properly be performed in a summary judgment posture. *See Hoopa Valley Tribe v. Nevins,* 881 F.2d 657 (9th Cir.1989) (affirming trial court's grant of summary judgment and decision that California's tax on tribe's timber revenues was preempted), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990). Thus, the district court properly decided the case in a summary judgment proceeding. *Id.*

■ The precise issue before this court is whether a sale of *services,* in contrast to a sale of *goods,* to an Indian enterprise on an Indian reservation is within the scope of the Indian trader statutes. At this point, we consider it beneficial to quote the Department's own words in framing the issue before us:

> There is no question that the Indian trader statutes preempt state taxes on covered activities. The issue here is whether coverage of those statutes historically and currently extends beyond the sale of goods to include services. The issue is not whether those statutes should cover services. That is a legislative decision. The question is whether Congress in enacting those statutes in 1834 and 1876 intended them to apply to anything but the sale of goods. A secondary issue is whether the Secretary of the Interior, by promulgating a particular regulation—25 C.F.R. 140.5—has interpreted the Indian trader statutes to permit regulation of the sale of services to Indians on reservations by licensed Indian traders, and, if so, whether such interpretation is permissible.

Specifically, the Department's argument is that, because the Indian trader statutes do not specifically include the word "services," the word "trade," as used in the Indian trader statutes, refers only to trade in goods and not to trade in services. We disagree.

The United States Supreme Court has stated that the Indian trader statutes must be given " 'a sweep as broad as [their] language, * * * and interpret[ed] * * * in

light of the intent of the Congress that enacted them.' " *Central Mach. Co.,* 448 U.S. at 166, 100 S.Ct. at 2596. In that case, the court held that imposition of the state tax was preempted by the Indian trader statutes even though the seller was not a licensed Indian trader and did not have a permanent place of business on the reservation. *Id.* at 165, 100 S.Ct. at 2596.

Given the purpose of the Indian trader statutes—"to prevent 'fraud and imposition' upon [the Indians]," *Central Mach. Co.,* 448 U.S. at 163, 100 S.Ct. at 2594–95—there is little reason to distinguish between the sale of goods and the sale of services. The potential for fraud and imposition in the sale of services is perhaps even greater than the potential provided by the sale of goods. Is it, however, too great a stretch in the meaning of "trade" to include the purchase and sale of services? The interpretation of the word "trade" as used in the Indian trader statutes is apparently a matter of first impression in reported court decisions. *But cf. United States ex rel. Keith v. Sioux Nation Shopping Ctr.,* 488 F.Supp. 496, 499 (D.S.D.) (district court notes that it has previously granted motions for summary judgment on the basis that 25 U.S.C. Section 264 "applies only to those who deal in goods."), *aff'd,* 634 F.2d 401 (8th Cir.1980).

The Department, noting that the origins of the Indian trader statutes lie in the early years of our nation, contends that the words "trade" and "trader" have consistently been used in these statutes to refer only to trade in goods. It points to provisions in these acts that require the forfeiture of goods by traders who violate the statute and provisions that permit the federal government to regulate the prices of goods. The Department contends that in the late 1700s and 1800s, when these statutes were enacted, "[t]he economy was based on trade in goods, not the provision of services, as it is today. The era of the service economy was not to come for over a century."

In further support of its position, the Department cites a portion of the definition contained in Webster's Third New Interna-

tional Dictionary (1976) (Webster's), which defines the noun "trade" as "the business of buying and selling or bartering commodities: exchange of goods for convenience or profit" and defines the verb "trade" as "to give in exchange for another commodity." *Id.* at 2421. To establish the meaning at the time of enactment of the early Indian trader statutes, the Department observes that the dictionary cites usage of the verb "trade" by James Fenimore Cooper as follows: "[T]he white men who penetrated to the * * * wilds were always ready * * * to trade rifles and watches."

We are not convinced. Raytheon and Laguna cite a study by the National Bureau of Economic Research showing that services constituted 32% of the gross national product as long ago as 1839. National Bureau of Economic Research, *Output, Employment and Productivity in the United States after 1800* (New York, 1966). Other dictionary definitions include "the business one practices or the work in which one engages regularly: one's calling: gainful employment: OCCUPATION," and references are made to a variety of occupations, including doctors, carpenters, and writers, all of whom provide services, as well as to merchants. Webster's, *supra*, at 2421. More importantly, the word, "trade" had a broader meaning than simply transactions in goods when used in contexts similar to the Indian trader statutes.

Courts that have considered the meaning of the word "trade" have regularly rejected the narrow definition proposed by the state. In *The Nymph*, 18 F.Cas. 506 (C.C.D.Me.1834) (No. 10,388), Supreme Court Justice Story, sitting as a circuit justice, interpreting the word "trade" as used in the coasting and fishery act of 1793, rejected a definition limiting "trade" to "traffic in goods, or buying and selling in commerce or exchange" in favor of a broader definition. He wrote:

> [T]he word "trade" is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile * * * Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a

shoe-maker, though some of these may be, and sometimes are, carried on without buying or selling goods.

*Id.* at 507.

The Supreme Court, in *United States v. Hutto*, 256 U.S. 524, 41 S.Ct. 541, 65 L.Ed. 1073 (1921), and *Ewert v. Bluejacket*, 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858 (1922), considered a statute forbidding persons involved in Indian affairs from having "any interest or concern in any trade with the Indians." *Ewert*, 259 U.S. at 135, 42 S.Ct. at 443. In *Hutto*, the charges included involving Indians in loan transactions, as well as transactions involving the sale of land, automobiles, and other commodities. The Supreme Court did not distinguish among the charges, indicating that it believed the prohibition against trade with the Indians was broad enough to include the service of lending money to the Indians. In *Ewert*, the Supreme Court rejected the argument that:

> the "trade with the Indians" in which persons employed in Indian affairs were prohibited by the section from engaging must be confined to trade with [Indians] when conducted as a business or occupation—to merchants or dealers supplying the Indians with the necessities or conveniences of life. Having regard to the purpose of the statute [to protect the Indians], we think that no such narrow interpretation can be given to the section.

*Ewert*, 259 U.S. at 137, 42 S.Ct. at 444.

Similarly, in *Jordan v. Tashiro*, 278 U.S. 123, 49 S.Ct. 47, 73 L.Ed. 214 (1928), the Supreme Court considered the definition of the word "trade" as used in a 1911 treaty that granted Japanese citizens the right to "carry on trade" within the United States. California contended that this provision did not allow a Japanese citizen to operate a hospital as a business enterprise and argued that "trade" was limited to the purchase, sale, or exchange of goods and commodities. The Supreme Court rejected this argument, stating:

> While in a narrow and restricted sense the terms "commerce," or "commercial," and "trade" may be limited to the pur-

chase and sale or exchange of goods and commodities, they may connote, as well, other occupations and other recognized forms of business enterprise which do not necessarily involve trading in merchandise. And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it embraces every phase of commercial and business activity and intercourse.

*Id.* at 127–28, 49 S.Ct. at 48 (citations omitted). The Court noted that "trade" had been interpreted as including carrying on a business as a pawnbroker. *Id.* at 128, 49 S.Ct. at 48–49. *But see Clarke v. Deckebach,* 274 U.S. 392, 395, 47 S.Ct. 630, 631, 71 L.Ed. 1115 (1927) (treaty protection of "merchants and traders" did not protect owner of poolroom). In *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932), the Supreme Court interpreted the word "trade," as used in the Sherman Act, as including the provision of cleaning and dyeing services.

Further support for a broad definition of "trade" can be found in the opinions in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). Samuel Worcester had been convicted of violating a Georgia law prohibiting persons from residing within the Cherokee Nation without a state permit. Worcester's crime was living with the Indians as a missionary, by authority of the President of the United States. He challenged his conviction on the grounds that the Georgia law violated the United States Constitution, treaties entered into between the United States and the Cherokee Indians, and the Indian trader act of 1802. Although Justice Marshall did not refer to any specific provision of the 1802 law that was violated by the Georgia statute, he did write that the Georgia statutes were in "hostility with the acts of congress for regulating this intercourse [with the Indians]." *Id.* 31 U.S. (6 Pet.) at 562. In a concurring opinion, Justice McLean specifically stated that the Georgia laws were repugnant to the 1802 act. *Id.* at 578. Although Justice McLean may have been relying on Section 3 of the 1802 act (which

required persons entering Indian Country to obtain a passport from a state governor, military officer, or other person designated by the President), it appears that he relied on Section 7, which prohibited any person to reside with the Indians as a trader without a license from the federal government. The opinion focuses on Worcester's residence with the Indians and the regulation of trade by the 1802 statute, not the mere passage of Worcester into Indian Country. For example, Justice McLean wrote:

> The restrictions imposed by the law of 1802, come strictly within the power to regulate trade; not as an incident, but as a part of the principal power. It is the same power, and is conferred in the same words, that has often been exercised in regulating trade with foreign countries * * * *
>
> In the regulation of commerce with the Indians, congress have exercised a more limited power than has been exercised in reference to foreign countries. The law acts upon our own citizens, and not upon the Indians, the same as the laws referred to act upon our own citizens in their foreign commercial intercourse.

*Id.* at 592. At the least, the opinions in *Worcester* establish that the purpose of the 1802 act was to control in the broadest sense all intercourse with the Indians in their territory. Such a purpose suggests that the words "trade" and "trader" in the statute were used in their broadest senses.

The language of the 1834 Indian trader statute further supports such a construction. Section 5 reads:

> *And be it further enacted,* That no license to trade with the Indians shall be granted to any persons except citizens of the United States: *Provided,* That the President shall be authorized to allow the employment of foreign boatmen and interpreters, under such regulations as he may prescribe.

The language implies that boatmen and interpreters—who perform services—needed a "license to trade" under the act. Even if the proviso in this section was designed primarily to permit foreign boatmen and interpreters to be employed by those who

traded in goods with the Indians, the fact that every employee of a trader (even though not employed to engage personally in trading goods with the Indians) needed a trader's license again shows, at the least, that "trade" was to be given a broad interpretation.

Additionally, the United States Interior Department has interpreted the Indian trader statutes in a manner that supports the district court's interpretation of "trade." The Secretary of the Interior's interpretation of a statute within his regulatory purview is entitled to deference by the courts. *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976); *see also Public Serv. Co. v. New Mexico Pub. Serv. Comm'n*, 106 N.M. 622, 625, 747 P.2d 917, 920 (1987) (stating that "courts should accord deference to the interpretation given to a statute by the agency to which it is addressed.").

The regulations promulgated by the Interior Department to implement the Indian trader statutes are 25 C.F.R. Parts 140 and 141. Part 140, entitled "Licensed Indian Traders," defines "[t]rading" as "buying, selling, bartering, renting, leasing, permitting and any other transaction involving the acquisition of property *or services.*" 25 C.F.R. § 140.5(a)(6) (emphasis added). The Department argues that this definition does not reflect the Interior Department's interpretation of the Indian trader statutes because it is contained in a section titled "Bureau of Indian Affairs employees not to contract or trade with Indians except in certain cases." 25 C.F.R. § 140.5. Thus, the Department contends, definitions contained in the section must only refer to that section, and not to the following sections that specifically pertain to Indian traders. We disagree.

The regulation states that the definitions apply to "this part." 25 C.F.R. § 140.5(a). In arguing that the definitions contained in Section 140.5(a) are not intended to apply to all of Part 140, the Department asks us to ignore the plain language of the regulation. In any event, even if the definitions in Section 140.5 were intended to apply only

to regulations governing BIA employees, there is no reason to believe that a different definition would be appropriate in construing the Indian trader statutes. The restrictions on dealings between Indians and BIA personnel have a common ancestry with the Indian trader statutes. The original restrictions appear in companion legislation to the 1834 Indian trader and intercourse act. These two statutes were "intimately connected" and "parts of a system." H.R.Rep. No. 474, 23d Cong., 1st Sess. 1 (1834). It is natural to assume that the word "trade" should bear the same meaning in those statutes and their progeny. The 1834 restrictions on trading between government personnel and Indians have long been interpreted as including service transactions. *See* S.Rep. No. 372, 76th Cong., 1st Sess. (1939).

Furthermore, Part 141, which contains the regulations promulgated by the Interior Department regarding business practices on the Navajo, Hopi, and Zuni reservations, similarly demonstrates that federal agency's interpretation of the Indian trader statutes as allowing the agency to regulate services provided on the reservations. Part 141 is intended "to prescribe rules for the regulation of reservation businesses for the protection of Indian consumers on the Navajo, Hopi and Zuni Reservations as required by 25 U.S.C. 261–64." 25 C.F.R. § 141.1. Although the terms "trade" and "trading" are not specifically defined, the scope of the regulations is clearly intended to include businesses that provide services. The regulations prohibit a person from owning or leasing a "reservation business" without a license. 25 C.F.R. § 141.5(a). A "reservation business" is defined to include persons engaged "in the sale or purchase of goods or services or in consumer credit transactions." 25 C.F.R. § 141.3(1). Clearly, the Interior Department views its authority to issue licenses to "reservation businesses" as deriving from its authority to license "traders." It follows that the Interior Department views the word "traders" within the meaning of the Indian trader statutes to encompass those dealing in services.

These authorities persuade us that the term "trade" as used in the Indian trader statutes should be broadly defined to include trade in services. Like the statute discussed in *Ewert*, the Indian trader statutes are intended to protect the Indians from fraud. *See Central Mach. Co.*, 448 U.S. at 163, 100 S.Ct. at 2594–95. Additionally, for more than 150 years, the Supreme Court and the federal courts have refused to limit the definition of "trade" to trade in goods. *See, e.g., Jordan v. Tashiro; The Nymph.* The agency responsible for administering the Indian trader statutes has interpreted the statutes as allowing for the regulation of services. *See* 25 C.F.R. § 140.5(a)(6). Finally, the Supreme Court has stated that the Indian trader statutes should be broadly construed. *Central Mach. Co.*, 448 U.S. at 167, 100 S.Ct. at 2597.

The Department also relies on *Ramah Navajo School Board, Inc. v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), and *Rodey, Dickason, Sloan, Akin & Robb, P.A. v. Revenue Division*, 107 N.M. 399, 759 P.2d 186 (1988), to argue for a restrictive interpretation of the Indian trader statutes. Once again, we quote verbatim from the Department's argument contained in its brief:

> The issue of taxing services sold to tribal entities on reservations has, indeed, been litigated, but without ever referring to the Indian trader statutes. In *Ramah*, New Mexico imposed its gross receipts tax on the services of constructing a building on the Navajo reservation. The Supreme Court ultimately ruled that a federal statute concerning Indian education preempted the state tax. No mention was ever made of the Indian trader statutes. Why not? *Warren Trading Post* and *Central Machinery* had already definitively held that any activity which came within the scope of the Indian trader statute could not be subjected to state tax. If the Indian trader statutes indeed extended to services, the decision in *Ramah* would have been unanimous and one sentence long: "The case is controlled by *Warren Trading Post* and *Central Machinery*." In-

stead, the Court completely ignored the Indian trader statutes and decided the case on the basis of other statutes. In [*Rodey* ], the issue was the provision of legal services to the Navajo tribe, performed partially on and partially off the reservation. Again, in arguing the issue of preemption to this court, *Rodey* placed no reliance on the Indian trader statutes as the federal law that preempted the provision of services to tribes. The only relevant federal statutes discussed by the courts in *Rodey* were those dealing with the employment of claims counsel.

In posing its argument, we believe that the Department has provided the basis for our determination that its reliance on *Ramah* and *Rodey* is misplaced. In neither case did any of the parties rely on the Indian trader statutes. Instead, other federal legislation was at issue and was ultimately dispositive of the issues raised by the parties. The failure of these decisions specifically to address the issue of whether the sale of services was within the scope of the Indian trader statutes is, in our judgment, a weak basis for determining that services are thus excluded. In addition, *Rodey* specifically restricted itself to services provided off of the reservation; therefore, the Indian trader statutes would have no application.

We recognize that previous opinions of the Tenth Circuit Court of Appeals and New Mexico courts have held that New Mexico's gross receipts tax may be imposed on a non-Indian performing services on Indian lands. *See Mescalero Apache Tribe v. O'Cheskey*, 625 F.2d 967 (10th Cir.1980); *Tiffany Constr. Co. v. Bureau of Revenue*, 96 N.M. 296, 629 P.2d 1225 (1981); *G.M. Shupe, Inc. v. Bureau of Revenue*, 89 N.M. 265, 550 P.2d 277 (Ct.App. 1976). However, for the reasons that follow, we do not consider these particular opinions controlling.

*G.M. Shupe* rejected the applicability of the Indian trader statutes solely on the ground that the taxpayer was not an Indian trader. *G.M. Shupe*, 89 N.M. at 268, 550 P.2d at 280. The court did not explain, however, why the contractor was not an

Indian trader. One obvious reason was that the taxpayer's contract was with the federal Bureau of Reclamation, not an Indian entity. *G.M. Shupe* does not stand for the proposition that services are not covered by the Indian trader statutes.

*Tiffany* may suggest that services rendered to a tribe on tribal land by a non-Indian contractor are subject to New Mexico's gross receipts tax. *See Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973) (court of appeals must follow supreme court precedent). However, this court may consider whether supreme court precedent is applicable. *Walker v. Maruffi*, 105 N.M. 763, 737 P.2d 544 (Ct.App.1987). We hold that *Tiffany* is inapplicable because that opinion did not discuss whether the Indian trader statutes apply to service providers on the reservations.

As for *Mescalero Apache Tribe*, although the opinion on rehearing in that case might be read as stating that the Indian trader statutes do not govern trade in services, that opinion certainly offers no reasoning in support of that conclusion.[3] We therefore see no reason to defer to that opinion on the same issue before us.

For these reasons, we determine that *G.M. Shupe*, *Tiffany*, and *Mescalero Apache Tribe* do not compel reversal of the district court's decision in this case. *Cf. Walker*, 105 N.M. at 769, 737 P.2d at 550 (where our supreme court did not address issue, precedent not controlling on this court).

CONCLUSION

We determine that the word "trade" as used in the Indian trader statutes includes trade in services. Therefore, as conceded by the State, the preemption analysis applied in *Warren Trading Post* and *Central Machinery* applies to the transaction between Laguna and Raytheon in this appeal. Consequently, we hold that the Department's taxation of services rendered to the tribal enterprise on the reservation was preempted by federal law. We therefore affirm the district court's decision.

IT IS SO ORDERED.

HARTZ, J., concurs.

BLACK, J., dissents.

BLACK, Judge (dissenting).

I do not find that the language of the Indian trader statutes provides any indication that such legislation was intended to preempt state taxation of non-Indians providing services to tribal entities. In situations where the intent of Congress is less than clear on the face of the statute, I believe it is necessary to make a factual inquiry into the state, federal, and tribal interests at issue in order to determine whether preemption is implicit in the federal legislation. Since no such inquiry was conducted in this case, I must dissent.[1]

---

**3.** It appears that the *Mescalero Apache Tribe* court first rejected the suggestion that *Warren Trading Post* was applicable because *Warren Trading Post* concerned a licensed trader that was a permanent enterprise on the reservation and the court considered the licensing of the contractor in the case before it "a pretext or a fiction." *Mescalero Apache Tribe*, 625 F.2d at 971. Days after the Tenth Circuit Court of Appeals entered its decision, the Supreme Court filed its decision in *Central Machinery*. That case involved one transaction with a company not on Navajo land and not licensed by the Bureau of Indian Affairs. *Central Machinery Co.*, 448 U.S. at 165, 100 S.Ct. at 2596. On motion for rehearing, the Tenth Circuit Court of Appeals stated that, in its original opinion, it did not consider that the matter was controlled by the Indian trader statutes. That is true. The court had relied on the facts that the business in question was not licensed and on Navajo land, facts the Supreme Court in *Central Machinery*

concluded were irrelevant. The Tenth Circuit court could have addressed the change in the law that the new Supreme Court case created. Yet, the circuit court merely stated without specifics that the new case did not present any new considerations. *Mescalero Apache Tribe*, 625 F.2d at 990. Because we believe that *Central Machinery* expanded the preemptive reach of the Indian trader statutes, we cannot follow *Mescalero Apache Tribe*.

**1.** The majority insists on labeling my opinion as one which reaches the "conclusion that services are not governed by the Indian trader statutes." Maj. at 648 n. 1, 845 P.2d at 171 n. 1. This is incorrect. I cannot tell from the language of the Indian trader statutes whether Congress intended them to apply to services or not. In such a situation, I believe it is necessary to make a particularized inquiry into the state, federal, and tribal interests involved before preemption can be found implicit in such federal

I also do not view *Warren Trading Post* or *Central Machinery* as dispositive of this appeal. I agree with the recent observation of the Arizona Court of Appeals that "the holding in *Warren Trading Post* did not establish that federally licensed Indian traders could not be subjected to a state tax." *State ex rel. Ariz. Dep't of Revenue v. Dillon,* 170 Ariz. 560, 826 P.2d 1186, 1193 (Ct.App.1991); *see also Milhelm Attea & Bros. v. Department of Taxation & Finance,* 181 A.D.2d 210, 585 N.Y.S.2d 847 (1992). Since the Arizona tax at issue in *Warren Trading Post* was only applicable to " 'selling any tangible personal property whatever at retail,' " 380 U.S. at 686 n. 1, 85 S.Ct. at 1243 n. 1 (quoting Ariz.Rev.Stat. § 42–1312), it is not clear to me how the Court's invalidation of state taxation of such transactions provides any guidance as to the meaning of congressional silence with regard to services. I cannot disagree with the majority's abbreviated quotation from *Central Machinery,* that the Indian trader statutes must be given " 'a sweep as broad as [their] language, * * * and interpret[ed] * * * in light of the intent of the Congress that enacted them.' " Maj. at ——, 845 P.2d at 172 (quoting *Central Mach. Co.,* 448 U.S. at 166, 100 S.Ct. at 2596). However, even reading the language broadly, I can decipher no intent to include or exclude "services" within that language. Moreover, like *Warren Trading Post, Central Machinery* dealt with a tax on the sale of tangible goods to an Indian tribe, again a transaction long recognized to be preempted by the Indian Trader Act. *Cf. Moore v. Board of County Commissioners,* 2 Wyo. 8 (1878) (county lacked authority to tax property and trade stock of federally licensed trader).

I would further note that in neither case did the Supreme Court find the facial language of the Indian Trader Act was per se preemptive of state taxation. Rather, the Court analyzed the pervasiveness of federal regulation as it applied to the specific transaction at issue in each case, exactly the type of analysis I believe is required here. The Court considered the relationship of the transactions sought to be taxed in light of state, tribal, and federal interests and struck the balance against state taxation in both of these cases. *Warren Trading Post Co.,* 380 U.S. at 689–91, 85 S.Ct. at 1245–46; *Central Machinery Co.,* 448 U.S. at 165 n. 4, 100 S.Ct. at 2596 n. 4.

The analysis of the legal propriety of state taxation of reservation business normally begins with a determination of the incidence of the tax. Felix S. Cohen, *Handbook of Federal Indian Law* 413 (1982). If the state tax falls directly upon an Indian individual or a tribe, the tax is preempted unless specifically authorized by Congress. *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. ——, ——, 112 S.Ct. 683, 687–88, 116 L.Ed.2d 687, 697 (1992). In the present case the incidence of the New Mexico gross receipts tax is clearly upon Raytheon. *See Mescalero Apache Tribe v. O'Cheskey,* 625 F.2d 967, 969 (10th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1417, 67 L.Ed.2d 383 (1981), *reh'g denied,* 455 U.S. 929, 102 S.Ct. 1296, 71 L.Ed.2d 474 *and* 459 U.S. 1025, 103 S.Ct. 393, 74 L.Ed.2d 522 (1982); *Tiffany Constr. Co. v. Bureau of Revenue,* 96 N.M. 296, 629 P.2d 1225 (1981). When the incidence of the tax is on the non-Indian, the United States Supreme Court has adopted an ad hoc balancing, rather than creating a per se rule, or even a presumption, of federal preemption. *Rodey, Dickason, Sloan, Akin & Robb, P.A. v. Revenue Div.,* 107 N.M. 399, 759 P.2d 186 (1988), *appeal dismissed,* 490 U.S. 1043, 109 S.Ct. 1948, 104 L.Ed.2d 418 (1989); Cohen, *supra,* at 413; Katherine B. Crawford, Note, *State Authority To Tax Non–Indian Oil & Gas Production on Reservations: Cotton Petroleum Corp. v. New Mexico,* 1989 Utah L.Rev. 495, 498–504, 511.

The balancing begins with an examination of "the language of the relevant feder-

---

legislation. While I agree that such a balancing could result in a summary judgment for either side, that remedy is only appropriate where there are no reasonable conflicting inferences bearing upon material facts. *Ellingwood v. N.N. Investors Life Ins. Co.,* 111 N.M. 301, 805 P.2d 70 (1991). Based on the record before us, I do not believe that is the situation here.

al treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144–45, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980).

The language of the Indian Trader Act nowhere refers to "services." Indeed, the actual language used by Congress in the Act would more likely contemplate the regulation of trade in tangible goods rather than services. For example: 25 U.S.C. § 261 gives the Commissioner of Indian Affairs authority to regulate "the kind and quantity of goods and the prices at which such goods shall be sold to the Indians"; 25 U.S.C. § 263 authorizes the President "to prohibit the introduction of goods, or of any particular article into the country belonging to any Indian tribe"; and 25 U.S.C. § 264 provides that one "who shall attempt to reside in the Indian country, or on any Indian reservation, as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession." Further factual inquiry may prove the state has no legitimate role in taxing non-Indians providing services on the reservation, but I fail to find it in the language originally adopted by Congress two centuries ago.

The majority relies upon the canon of construction that ambiguities are to be decided in favor of the Indians. I do not disagree with this as a legal proposition, but I find no ambiguity and this canon cannot be used to construe a statute in a manner never contemplated by Congress. *Glover Constr. Co. v. Andrus,* 591 F.2d 554 (10th Cir.1979), *aff'd,* 446 U.S. 608, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980); *Fry v. United States,* 557 F.2d 646 (9th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978). I find no evidence that Congress ever even considered whether the Indian Trader Act should apply to the sale of services as well as goods.

Like the language of the Act itself, the historical context can be interpreted as consistent with a congressional intent to adopt a traditional and narrow definition when regulating traders. A major impetus for licensing those wishing "to trade" with the Indians was the introduction of firearms and liquor by early fur traders. Francis P. Prucha, *American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts 1790–1834* 7–8, 71 (1970). Early cases dealing with the licensing provisions of the Indian Trader Act also invariably dealt with problems arising from trade in merchandise. *American Fur Co. v. United States,* 27 U.S. (2 Pet.) 358, 7 L.Ed. 450 (1829); *Gould v. Kendall,* 15 Neb. 549, 19 N.W. 483 (1884); *Noble v. Amoretti,* 11 Wyo. 230, 71 P. 879, 881 (1903) ("It is manifest that, to trade with the Indians, [the traders] must have goods to sell.").

The earliest versions of the Indian Trader Act prohibited its application "to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the individual states." Act of May 19, 1796, ch. 30, 1 Stat. 474; Act of Mar. 30, 1802, ch. 13, 2 Stat. 145. Once the Indians became surrounded by a "white population, which carries on with them almost every kind of commerce incident to their condition," at least one early court held the Indian Trader Act could no longer be applied. *United States v. Cisna,* 25 F.Cas. 422, 424–25 (C.C.D.Ohio 1835) (No. 14,795). This decision could be seen as a finding that the Act was intended for the frontier where illicit goods could be confiscated, but could not be enforced when Indians engaged in "almost every kind of commerce" with their white neighbors.

While it is possible that the failure to mention "services" in any of the various versions of the Act was an oversight, when Congress wished to regulate the provision of services to Indians in other contexts, it

has done so explicitly. *See, e.g.,* 18 U.S.C. § 437 (1988) (amended in 1980 to include "service" in what federal employees "may purchase from or sell to any Indian," Act of June 17, 1980, 94 Stat. 544); *Smith & Steele v. Martin,* 28 Okl. 836, 115 P. 866 (1911); *Hanks v. Hendricks,* 58 S.W. 669 (Ct.App.Ind.Terr.1900).[2]

Nor am I convinced by the majority's reference to twentieth century cases implying that "trade" may encompass more than barter in tangible commodities. *United States v. Hutto,* 256 U.S. 524, 41 S.Ct. 541, 65 L.Ed. 1073 (1921), involved the sale of commodities, land, and autos, and the only "service" even arguably included was the financing of these transactions. *Ewert v. Bluejacket,* 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858 (1922), also dealt with a sale of tangible property and referenced several definitions which would limit "trade" to such transactions. Broader dicta employed by the Court in describing "trade" would therefore appear confined by the factual context. Moreover, although the majority opinion relies on cases which use language broad enough to include services within trade, it ignores an equal number of earlier cases and law dictionaries which define trade exclusively in terms of tangible "merchandise," "chattels," and/or "goods." *The Active,* 11 U.S. (7 Cranch) 100, 3 L.Ed. 282 (1812); *The Two Friends,* 24 F.Cas. 433 (C.C.D.Mass.1812) (No. 14,289); *Wakeman v. Hoyt,* 28 F.Cas. 1350 (C.C.D.Conn.1841) (No. 17,051); *In re Chandler,* 5 F.Cas. 447 (D.Mass.1870) (No. 2,591); *see also Albuquerque Lumber Co. v. Bureau of Revenue,* 42 N.M. 58, 75 P.2d 334 (1937).

In large measure, the definition must depend on its context and whether "trade" is employed as a verb or as a noun. Nothing I have been able to locate in the *Annals of Congress* indicates Congress understood or employed the term "trade" in

what the majority calls the "broader" sense, i.e., " 'equivalent to occupation, employment, or business, whether manual or mercantile.' " Maj. at ——, 845 P.2d at 173 (quoting from *The Nymph,* 18 F.Cas. at 507). It is very clear, however, that the relevant Congress definitely understood "trade" as a transitive verb in its more traditional sense, i.e., the barter of goods. We know this from congressional use of the term in the Indian Trader Act of 1802, ch. 13, 2 Stat. 139. Section 9 of that version of the Act provides:

> *And be it further enacted,* That if any such citizen, or other person, shall purchase, or receive of any Indian, in the way of trade or barter, a gun, or other article commonly used in hunting, any instrument of husbandry, or cooking utensil, of the kind usually obtained by the Indians, in their intercourse with white people, or any article of clothing, excepting skins or furs, he shall forfeit a sum not exceeding fifty dollars, and be imprisoned not exceeding thirty days.

*Id.* at 142.

It also seems that the early Congresses understood that the "traders" regulated by the Act traded in tangible goods. In 1822, for example, Congress amended the 1802 Indian Trader Act and gave the President power to direct Indian agents, territorial governors, and military officers "to cause the stores and packages of goods of all traders to be searched, upon suspicion or information that ardent spirits are carried into the Indian countries by said traders." Act of May 6, 1822, ch. 58, 3 Stat. 682.

Most significantly, courts which have considered this issue, i.e., whether the Act was intended by Congress to apply to "services," have rejected the conclusion adopted by the majority. *United States ex rel. Keith v. Sioux Nation Shopping Cen-*

---

**2.** If, indeed, Congress has anywhere intimated the intent to regulate Raytheon's contract to provide management services to Laguna Industries, it would appear to be within the ambit of 25 U.S.C. § 81 (1988) (contract regarding operations on Indian land) rather than the Indian Trader Act. *Green v. Menominee Tribe,* 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914) (contract requiring Indians to pay for logging supplies out of proceeds of logging governed by precursor to 25 U.S.C. § 81 even though non-Indian party to contract was a licensed Indian trader); *Wisconsin Winnebago Business Comm. v. Koberstein,* 762 F.2d 613 (7th Cir.1985) (25 U.S.C. § 81 applied in the absence of federal statutes directly regulating management contract regarding reservation bingo by tribal enterprise).

*ter,* 488 F.Supp. 496, 499 (D.S.D.) (mem.), *aff'd.,* 634 F.2d 401 (8th Cir.1980); *Mescalero Apache Tribe,* 625 F.2d at 990.[3]

Again, while it may be a balancing of state, federal, and tribal interests will support the implicit preemption of the New Mexico gross receipts tax on Raytheon, I do not think the record before us can sustain such a summary conclusion. The legal and historical authorities relied upon by the district court and the majority at best seem evenly balanced. Such a case is not appropriate for summary judgement. *Fischer v. Mascarenas,* 93 N.M. 199, 598 P.2d 1159 (1979).

Finally, I do not believe the majority gives proper weight to the teachings of *Cotton Petroleum.* In *Cotton,* the Court upheld a state tax on a non-Indian producing oil and gas from the Jicarilla Apache Reservation. The *Cotton* majority largely ignored *Warren Trading Post* and *Central Machinery.* Rather, it was the dissenters in *Cotton* who argued these precedents were controlling. 490 U.S. at 210–11, 109 S.Ct. at 1725–26 (Blackmun, J., dissenting). I also believe the *Cotton* majority evidenced less willingness to find congressional intent to preempt state taxation of non-Indian business activities based on statutory silence. *See* Susan M. Williams, *State Taxation on Indian Reservations: The Impact of Cotton Petroleum Corporation v. New Mexico,* 36 Fed.B.News & J. 431, 434 (1989); Kristina Bogardus, Note, *Court Picks New Test in Cotton Petroleum,* 30 Nat.Resources. J. 919, 927–28 (1990).

In attempting to tailor centuries-old legislation to modern transactions, the United States Supreme Court has adopted a pragmatic approach. *See* Philip P. Frickey, *Congressional Intent, Practical Reasoning, and the Dynamic Nature of Federal Indian Law,* 78 Cal.L.Rev. 1137, 1168–74 (1990); Charley Carpenter, Note, *Preempting Indian Preemption: Cotton Petroleum Corp. v. New Mexico,* 39 Cath.U.L.Rev. 639, 655 (1990); Daniel Gluck, Note, *A Tale of Two Taxes—Preemption on the Reservation: Cotton Petroleum Corp. v. New Mexico,* 43 Tax Law. 359, 369 (1990). Since I do not see any evidence of congressional intent to prohibit state taxation of management services on the face of the ancient Indian Trader Act, I believe the particularized inquiry called for under the Court's pragmatic approach is necessary.

Based on the evidence currently before us, I cannot find a congressional intent to preempt state taxation of non-Indians offering services on the face of the Indian Trader Act. I believe Supreme Court precedent therefore requires that the district court consider the relative interests of the state, tribal, and federal governments in deciding upon the validity of the imposition of the New Mexico gross receipts tax upon Raytheon. I would remand for such a particularized inquiry, and I must therefore respectfully dissent.

---

**3.** The majority apparently interprets the Tenth Circuit opinion as turning on whether the non-Indian was a licensed trader. Maj. at 654 n. 3, 845 P.2d at 177 n. 3. I believe that, on the motion for rehearing, the Tenth Circuit Court specifically found the Indian trader statutes applied to goods but not services. 625 F.2d at 990; *see also* Richard W. Hughes, *Indian Law,* 12 N.M.L.Rev. 409, 452 (1982).